[Cite as *Habo v. Khattab*, 2013-Ohio-5809.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| KHALID HABO, | : | **O P I N I O N** |
| Plaintiff-Appellee/ Cross-Appellant, | : | |
| | : | **CASE NO. 2012-P-0117** |
| - vs - | : | |
| REHAB J. KHATTAB, | : | |
| Defendant-Appellant/ Cross-Appellee. | : | |
| | : | |

Appeal from the Portage County Court of Common Pleas, Domestic Relations Division, Case No. 2010 DR 00527.

Judgment: Affirmed.

*Charles E. Grisi* and *Charles M. Budde,* Grisi & Budde, 3250 West Market Street, Suite 100, Akron, OH 44333 (For Plaintiff-Appellee/Cross-Appellant).

*Gary M. Rosen* and *Mark A. Riemer,* 11 South Forge Street, Akron, OH 44304 (For Defendant-Appellant/Cross-Appellee).

*Pamela S. Harris,* 199 S. Chillicothe Road, Suite 205, Aurora, OH 44202 (Guardian ad litem).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Rehab Khattab ("mother") appeals the divorce decree entered by the Portage County Court of Common Pleas, Domestic Relations Division. At issue is whether the trial court abused its discretion in awarding custody of the parties' three

minor children to appellee, Khalid Habo ("father"), and in awarding mother an interest in father's pension. For the reasons that follow, we affirm.

{¶2} In October 2010, father filed a complaint for divorce from mother. Subsequently, the trial court appointed Attorney Pamala Harris as guardian ad litem for the parties' children.

{¶3} In August 2011, mother filed a motion to enforce a post-nuptual separation agreement signed by the parties in 2005 in Delaware. After a hearing on the issue, in October 2011, the trial court entered a judgment denying the motion.

{¶4} Also, in October 2011, mother filed a motion to remove the guardian ad litem and a motion to strike her testimony based on the guardian's alleged bias against mother. Following a hearing, the trial court denied the motion.

{¶5} The trial to the court lasted eight days between February 2012 and March 2012. Father and mother are medical doctors, both having received their medical degrees in Egypt. While father is licensed to practice medicine in the United States, mother never attempted to be licensed in this county. They were married in Egypt in 2000. Three children were born as issue of the marriage, two daughters, one, now age 11; the other, age 9; and a son, age 7.

{¶6} Lara Jester, the mother's friend, testified that in 2003, the parties moved to Delaware for father to complete his medical residency. They moved into an apartment across the hall from where Ms. Jester lived with her husband. Ms. Jester said that, about two months after the parties moved in, she heard them arguing. She said that in the seven months the parties lived in the apartment, she heard them arguing about seven times.

2

**{¶7}** Mother said that in early 2004, she and father briefly separated. In 2005, the parties signed a post-nuptual separation agreement and reconciled. In 2007, father was employed by Robinson Memorial Hospital in Ravenna, Ohio as a pediatrician, and the parties moved to the marital residence in Streetsboro, Ohio. Mother said that in late 2007, she began showing symptoms of obsessive compulsive disorder ("OCD"). Her OCD took the form of fear of contamination from germs and excessive cleaning in the marital residence.

**{¶8}** Father testified that mother enforced cleaning rituals, which he, the children, and others entering the home were required to perform. The father was required to go through these rituals each time he came home from work. In addition, if he touched a doorknob, mother immediately cleaned it with antimicrobial wipes. The children were not permitted to touch or hug father until he completed mother's cleaning rituals. The children were likewise required to perform these rituals each time they came in the house, whether from school or playing outside. In addition, guests entering the house were required to perform these rituals. The wife enforced these rituals due to her obsessive fear of contamination from germs. The trial court's judgment entry outlined in exhaustive detail the cleaning rituals created and enforced by mother, which involved cleaning each person entering the house with Clorox, alcohol, various disinfectants, and other cleaning chemicals.

**{¶9}** Marwa Sadalla, mother's close friend, testified that she and mother were like sisters. She said she tolerated mother's OCD behaviors because of their close relationship. She said that in September 2010, she and her two children visited mother

at the marital residence. Ms. Sadalla said that before she and her children were allowed to enter the house, mother required them to perform her cleaning rituals.

{¶10} Ms. Sadalla said that mother developed blisters on her hands, elbows, feet, and ankles, and the parties' younger daughter developed eczema from her constant exposure to mother's cleaning chemicals. In addition, the children developed allergies from their exposure to the cleaning chemicals.

{¶11} Officer Michael Cipriano of the Streetsboro Police Department testified that on November 1, 2010, mother called the department alleging she was being abused by father. The officer did not find any abuse by father, but, while inside the marital residence, the officer smelled a strong odor of chemicals that he associated with cleaning products. The smell was so strong that, after being in the house for a short time, it irritated his sinuses and started to interfere with his breathing. The smell stayed in his sinuses even after he left the house. As a result of the pervasive chemical fumes in the house, the officer contacted the Portage County Department of Job and Family Services reporting his observations and requesting an investigation.

{¶12} Mother admitted taking prescription-strength medication for her OCD in February 2008. Father testified that mother voluntarily stopped taking the medication after awhile because she believed he was contaminating it. Then, from July 2009 to December 2009, mother took the medication.

{¶13} In December 2009, mother began treatment with a psychiatrist, Dr. R.A. Pakeeree. He diagnosed mother with OCD in February 2010 and prescribed medication for her. Mother continued taking her medication until August 2010, when, according to father, mother again stopped taking it.

4

**{¶14}** Mother conceded that she stopped taking her medication in September 2010. She said she resumed taking her medication in November 2010, after a court hearing because, she said, the court made a big deal about her not taking her medication.

**{¶15}** Dr. Robin Tener, clinical psychologist, father's expert, testified she met with the parties and their children on numerous occasions between July and November 2011 to conduct an assessment. She said that mother told her she never stopped taking the medication prescribed for her OCD. However, when confronted with Dr. Pakeeree's notes that indicated this was not the case, mother admitted that for some time in 2010, she stopped taking her medication.

**{¶16}** Dr. Tener also testified that mother told her in September and October 2011, that she had been cured of her OCD and was no longer taking medication for it. However, Dr. Tener concluded that mother still suffers from OCD because, among other things, the children told her that mother still has them perform her cleaning rituals.

**{¶17}** The trial court found that, due to the conflicting reports made by mother concerning whether she stopped taking her medication, mother's statement that she never stopped taking it was not credible. Instead, the court found that mother stopped taking her medication in August 2010, which resulted in her OCD becoming severe and her cleaning rituals excessive.

**{¶18}** Mother testified that on or about November 18, 2010, the day the court issued its temporary orders, she moved the children in her bedroom, locked the door, and would not let them come out. She had an alarm installed on her bedroom door

because, she said, she was afraid father would take the children. The court found this conduct was an attempt by mother to alienate the children from their father.

{¶19} On the next day, November 19, 2010, while father was trying to take the children to school as was the family's custom, mother came out of the house and became hysterical in front of the children, yelling that father was going to harm the children and kidnap them.

{¶20} Dr. Tener, testified that during her interview with mother, she played for her a tape recording she had made of the November 19, 2010 incident, which, mother said, proved father was abusing her and the children.

{¶21} Dr. Tener testified that the tape showed mother was hysterical and screaming at father in front of the children, "Don't hurt my kids" over and over again. At one point, mother yelled "Don't hurt my kids" 12 times in a row. By Dr. Tener's count, mother yelled that plea over 70 times during the 20-minute incident.

{¶22} Dr. Tener said that, while mother was engaging in these histrionics, father could be heard in the background calmly telling the children to "get in the car" and telling mother, "I will take the children to school. * * * You will see them after school."

{¶23} Dr. Tener said that, while mother was using the tape to try to prove father was abusing the children, the tape actually showed it was mother's "hysteria" that caused the children to become upset and to resist being put in the car by father.

{¶24} After father was struggling to get the children in the car for about 20 minutes, mother called the police reporting domestic violence. The trial court found mother's actions that day were further evidence of her efforts to alienate the children from father.

**{¶25}** As a result of this incident, father was charged in the Portage County Municipal Court with domestic violence against mother and the parties' younger daughter. At trial mother testified the domestic violence consisted of father slapping the child once in the face. Father was convicted of domestic violence against the younger daughter, but acquitted as to the charge involving mother. On May 15, 2012, father was sentenced to probation.

**{¶26}** As a result of his conviction, father was terminated from his employment at Robinson Memorial, effective May 18, 2012.

**{¶27}** Mother testified that, after the November 19, 2010 incident, she told the children that if they did not visit father, he would have her arrested and put in jail. The court found these statements suggested to the children that father is a bad person trying to hurt mother, which was additional evidence of mother's efforts to alienate the children from father.

**{¶28}** The trial court also found that, despite the professional assistance made available to the parties, mother continued to engage in parental alienation.

**{¶29}** Ms. Harris, the children's guardian ad litem, testified she arranged the first supervised visit between father and the children to be held in her office on November 22, 2010. This was just three days after the alleged domestic violence incident on November 19, 2010. Ms. Harris said that during this meeting, all three children, including the younger daughter, were affectionate with father and eager to spend time with him. They did not demonstrate any fear of him. Based on the success of this visit, father's visitation with the children was modified from supervised to unsupervised.

**{¶30}** However, Ms. Harris testified that after this visit, the girls' attitude toward father drastically changed.

**{¶31}** Ms. Harris said that the next visit she arranged between father and the children was to be a four-day visit beginning on December 29, 2010. Ms. Harris was to meet father at the marital residence to pick up the children. At that time she observed "significant changes" on the part of the parties' oldest daughter. In mother's presence, the child resisted the visit. She was hysterical, crying, and screaming that she was not going with father and that he would hurt her. Neither the younger daughter nor the parties' son resisted the visit and both went in the car. However, as the son was leaving the home with the guardian, the older daughter grabbed him; kicked the guardian; and tried to pull the boy away from her. Mother then asked the older daughter, "Will you go with him if he brings you back tonight?" She immediately stopped screaming and agreed to go for the visit. However, a few hours later, the older daughter started yelling that she wanted to go home. She threatened father that if he did not take the children home, she would call the police and say father was harming them. As a result, father took them home, but first took them shopping at the mall.

**{¶32}** After December 29, 2010, the younger daughter's attitude toward father also changed. Shorty after that visit, father tried to pick up the children from school for a scheduled visit. When she saw father in the hallway, she began crying and yelling that he had hurt her.

**{¶33}** Based on the girls' increasing resistance to visits with father and their escalating accusations against him, his visits with them were changed to supervised.

8

{¶34} The court referred the parties to Carol Miller of Tallmadge Family Visitation and Mediation Services to assist with father's supervised visitation. Ms. Miller reported that the first visit on February 23, 2011 was difficult due to resistance from the parties' daughters. Ms. Miller said that at the second visit, the girls refused to get out of mother's car to participate. The girls were screaming and yelling at Ms. Miller, and mother did nothing to stop their outbursts.

{¶35} Ms. Miller said that at later visits, the girls continued to refuse to get out of mother's car. They would scream that they would not see father; that he hit them; and that he hurt mother. Mother said they had to visit with father or she would be arrested. In the girls' presence, mother said she did not blame them if they did not want to see father and that she would go to the Supreme Court to keep them from ever having to live with him. Ms. Miller said the girls' refusal to visit with father was not due to fear of him, but, instead, was a "game" to them. Ms. Miller's statement was based on her observation of the girls' smiling and smirking while screaming that father had abused them, which the trial court had also seen during its in-camera interviews.

{¶36} As a result of the girls' resistance, Ms. Miller advised the court that she could no longer assist with the supervised visitation.

{¶37} The court then referred the parties to Megin Petruzzi of Child Guidance and Family Solutions for counseling. However, after several attempts to counsel the children between March 2011 and September 2011, Ms. Petruzzi terminated services due to the girls' refusal to cooperate or even get out of mother's car.

{¶38} In July 2011, the court awarded father visitation with the son and continued supervised visitation with the girls. In court, mother vehemently objected to

9

the court's ruling and became highly emotional in the courtroom, protesting that the court had no right to allow father to have so much contact with the son.

{¶39} Following this hearing, mother attempted to interfere with father's visitation with the boy. Mother told him not to talk to the babysitter because she would testify against mother. This made him fearful about going to the sitter, and father started taking the boy to work at the hospital with him. Then, mother told the boy he should not go to the hospital with father because there were germs there and he might become ill.

{¶40} Dr. Tener testified that mother's intervention damaged the girls' attitude toward their father. Dr. Tener said that mother has engaged in alienating behavior that has adversely affected the girls' relationship with father. She said that mother has instilled in the girls the false belief that father wants to harm them or will contaminate them with his germs. Further, mother has no insight regarding her OCD or the harm her OCD and alienating behaviors have caused the girls. Thus, mother sees no problem with her behavior and no need to change it.

{¶41} Mother's expert, Dr. Douglas Darnell, psychologist, also testified that "mother engaged in * * * alienating behavior" and that the children's actions are consistent with "parental alienation syndrome." Dr. Darnell said that mother's purported rescue of the children when there was no real threat to their safety has sent them the message that father is dangerous or that there is something wrong with him. Dr. Darnell said mother is an "active alienator," meaning that she becomes more alienating when she is under stress, but later, when she is more composed, she can recognize her alienating behavior was inappropriate. An active alienator like mother vacillates between alienating behavior and being more composed, in contrast to the "obsessed

10

alienator," who is not receptive to counseling. Dr. Darnell stated that in his meetings with father and the girls, despite the girls' defiant and blatantly rude behavior toward father, he tried to reach out appropriately to the girls. However, each time he did, they "shut him off." They would turn their chairs around so their backs were facing him. Despite this rude behavior, father retained his composure.

{¶42} During the court's in-camera interviews with the three children, the parties' daughters said they hated father; that they never want to see him again; and that they only want to be with mother. Both girls repeatedly told the judge that if the court forced them to see father, it would "ruin their lives." The older daughter said that even talking with someone about father would ruin her life. The trial court found that the girls appeared to be reciting negative information about father previously told to them. In stark contrast, the parties' son spoke lovingly of his father; said he got along well with him; and smiled and happily responded to questions about his relationship with his father.

{¶43} Mother admitted at trial that her actions have caused the girls to become alienated from father, but testified that she did not know how to correct the situation she had created. While she acknowledged the girls' disrespectful behavior toward father is inappropriate, she said the girls are justified in not wanting to see him and that she cannot make them see him.

{¶44} A teacher and principal at the children's school both testified that, prior to the divorce case being filed, the children had a good and affectionate relationship with father, but that since that time, the girls' relationship and attitude toward him changed

drastically. For example, they heard the girls call father a liar. In contrast, both witnesses said that the son still has a good relationship with father.

{¶45} Dr. Tener stated in her report that, due to mother's complete lack of insight, she will continue to make serious allegations against father and will encourage the children to do so. The doctor said the children are currently being subjected to distorted parental influence by mother, which is "markedly unhealthy" for them. She said the only way to eliminate this harm is to prevent them from future exposure to the negative influence of mother that is so powerful, it has made it impossible for the children to accept and benefit from father's attention and support.

{¶46} Dr. Tener recommended father be designated the children's sole residential parent and that mother be given supervised visitation to ensure her contact with the children is neutral. She said that as long as the children stay with mother, nothing will change.

{¶47} Ms. Harris, the guardian ad litem, also recommended father be designated the children's sole residential parent and that mother's visitation be supervised. The guardian testified that as long as the girls remain with mother, the situation will not improve.

{¶48} Significantly, mother's expert, Dr. Darnell, also testified mother's actions have alienated the children from father. He said "an alienated child becomes a true believer." He said that the girls' alleged fear of father was not justified, but, due to mother's actions, it is real to them. Dr. Darnell said that mother had engaged in acts that constituted parental alienation. Despite the foregoing, Dr. Darnell recommended mother remain the children's residential parent.

**{¶49}** The court entered a highly-detailed, largely single-spaced 84-page divorce decree on August 22, 2012. With respect to the allocation of parental rights and responsibilities, the court made exhaustive factual findings about the parties' history and relationship with their children. The court also made findings regarding each of the ten best-interest factors. The court found mother's mental health to be the most significant factor. The court found that mother did not appreciate the severity of her condition or its devastating impact on the children. The court noted that mother openly blames father for her OCD. The court found that, due to mother's actions, the children now associate her cleaning rituals with father being contaminated and believe that by having contact with him, they, too, will become contaminated. The court found that, because mother is so committed to her cleaning rituals, the children now inappropriately see her conduct as normal.

**{¶50}** The trial court found the second most significant factor was mother's attempts to alienate the children from father. The court found that, while father never attempted to interfere with mother's relationship with the children, mother has taken deliberate and repeated steps to interfere with father's relationship with the girls. The court found mother instilled in the minds of the parties' daughters a distorted fear of father. The court found that mother's actions rise to the level of "extreme parental alienation."

**{¶51}** The court found that, because mother's actions inflicted such serious harm on the children, it was required to take drastic measures to prevent future harm to them. As a result, the court found it was in the children's best interests that father be designated their sole residential parent and that mother have supervised visitation.

13

{¶52} Mother appeals and father cross-appeals the divorce decree. Mother asserts four assignments of error. For her first assigned error, she alleges:

{¶53} "The Trial Court abused its discretion applying the best interests of the child analysis stated in R.C. 3109.04(F)(1) when it named Plaintiff-Appellee, who had been convicted of domestic violence against his daughter during the divorce litigation, the sole residential and legal custodian while only permitting supervised visitation for the Defendant-Appellant."

{¶54} This court has held that decisions involving the custody of children are "accorded great deference on review." *Bates-Brown v. Brown*, 11th Dist. Trumbull No. 2006-T-0089, 2007-Ohio-5203, ¶18. Thus, any judgment of the trial court involving the allocation of parental rights and responsibilities will not be disturbed absent a showing of an abuse of discretion. *Id.* The term "abuse of discretion" is one of art, connoting judgment exercised by a court, which does not comport with reason or the record. *Gaul v. Gaul*, 11th Dist. Ashtabula No. 2009-A-0011, 2010-Ohio-2156, ¶24.

{¶55} The highly deferential abuse-of-discretion standard is particularly appropriate in child custody cases since the trial judge is in the best position to determine the credibility of the witnesses, and there "may be much that is evident in the parties' demeanor and attitude that does not translate well to the record." *Wyatt v. Wyatt*, 11th Dist. Portage No. 2004-P-0045, 2005-Ohio-2365, ¶13. In determining whether the trial court has abused its discretion, a reviewing court is not to weigh the evidence, but, rather, must determine from the record whether there is some competent, credible evidence to sustain the findings of the trial court. *Clyborn v. Clyborn*, 93 Ohio App.3d 192, 196 (3d Dist.1994).

14

**{¶56}** Mother argues the court did not explain why it did not give much weight to the conviction. However, the court expressly stated in the decree that it considered father's conviction. The court ranked this factor as fourth in importance out of the ten best-interest factors. The court also heard the testimony of Dr. Tener, who summarized a tape recording mother had made of the incident giving rise to father's conviction. Based on the evidence presented, the court found that, in light of the circumstances, father's actions on November 19, 2010, were reasonable and necessary to get the children in his car so he could take them to school.

**{¶57}** Next, mother argues the court should have given more weight to father's long history of engaging in abuse against his family. By way of example, she refers to a 2004 civil protection order allegedly issued by a Delaware court. However, that protective order, in addition to being remote in time, is not referenced by mother as being in the record. Therefore, if it was issued, we have no idea of its terms or the reasons it was granted.

**{¶58}** As another example of father's alleged abuse, mother references the testimony of her friend, Lara Jester, who lived across the hall from the parties in Delaware for seven months. Ms. Jester testified that on one occasion, she heard "shuffling noises" coming from the parties' apartment, which she interpreted as someone being pushed. However, the trial court sustained father's objection to Ms. Jester's speculation as to the cause of the shuffling noise and mother has not appealed this ruling. Thus, mother's reliance on this testimony is unavailing.

**{¶59}** As another example of father's alleged abuse, mother references her and her sister's testimony that on one occasion father slapped mother. However, the

15

incident was not reported or corroborated by any independent evidence and mother sought no medical treatment for this alleged slapping incident.

{¶60} As a final example of father's alleged abuse, mother references the girls' allegations that father had abused them. However, in the divorce decree, the trial court questioned the reliability of the girls' reports of abuse. In support, the court noted that, during the in-camera interviews, the younger daughter could not provide any detail regarding alleged incidents of abuse and the older daughter provided the court with inconsistent answers to the court's questions regarding father's alleged abuse.

{¶61} Next, mother argues the trial court placed too much weight on her OCD because she alleges it is now under control. In support, she referred to the medical chart of her psychiatrist, Dr. Pakeeree. In Dr. Pakeeree's report, dated February 1, 2010, he diagnosed mother as having OCD and said she had a five-year history of obsessive-compulsive symptoms, which consisted of compulsive cleaning. Dr. Pakeeree prescribed medication for mother's OCD, but he reported she was "not receptive to any behavior modification treatment." Dr. Pakeeree's notes regarding mother's monthly visits between February 2010 and April 2010 show mother reporting she still has obsessive-compulsive symptoms and rituals. In Dr. Pakeeree's report of November 10, 2010, he said mother "has a diagnosis of OCD" with symptoms being compulsive cleaning and obsessive rituals. Dr. Pakeeree noted that in September 2010, mother voluntarily stopped taking the medication he had prescribed for her because she did not feel she needed it. Dr. Pakeeree's notes show that he saw mother once a month between November 1, 2010 and September 2011, during which visits mother said her OCD symptoms were now under control. However, the record does not include

any follow-up reports from Dr. Pakeeree after November 10, 2010. Thus, the last time Dr. Pakeeree expressed an opinion regarding mother's OCD was in November 2010. Moreover, Dr. Pakeeree did not testify at trial.

{¶62} In further support of mother's argument that the court put too much weight on her OCD, she refers to the psychological evaluation performed by the court-appointed psychologist, Virginia Clark, Ph.D., of Western Reserve Psychologists. However, in her report, dated March 31, 2011, four months after Dr. Pakeeree's last report, Dr. Clark said that mother has moderately severe OCD with symptoms of excessive cleaning rituals. At that time, Dr. Clark stated that mother currently "struggles with moderately severe OCD."

{¶63} Finally, mother argues the trial court's findings contradicted Dr. Clark's recommendation that mother remain the children's residential parent. However, this recommendation was tempered by Dr. Clark's finding that mother's "OCD significantly impacts the children's development and adjustment as they accommodate her compulsive rituals." Further, Dr. Clark recommended that mother "should remain on medication and participate in cognitive behavioral therapy for the treatment of her OCD." Thus, Dr. Clark found that mother still has OCD and OCD symptoms, including compulsive cleaning rituals.

{¶64} In any event, both Dr. Tener and Attorney Pamala Harris, the children's guardian ad litem, recommended that father be designated residential parent of the children and that mother's visitation be supervised. We note that Dr. Tener's report was dated November 30, 2011, more than one year after Dr. Pakeeree's last report regarding mother's OCD and eight months after Dr. Clark's report. The trial in this case

17

began on February 6, 2012.  Thus, the most recent doctor's report prior to trial was that of Dr. Tener.

**{¶65}** We therefore hold the trial court did not abuse its discretion in allocating parental rights and responsibilities.

**{¶66}** Mother's first assignment of error is overruled.

**{¶67}** For her second assigned error, mother alleges:

**{¶68}** "The trial court committed reversible error by not applying Delaware contract law to determine the validity of the Separation Agreement."

**{¶69}** Mother argues the trial court erred in not applying Delaware law in ruling on her motion to enforce the parties' 2005 separation agreement.  However, the trial court did not address the choice of law issue because mother did not raise it in her motion to enforce.  "'[A]n appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.'" *Warren v. Warner Realty*, 11th Dist. Trumbull No. 98-T-0117, 1999 Ohio App. LEXIS 4976, *5 (Oct. 22, 1999), quoting *State v. Childs*, 14 Ohio St.2d 56 (1968), paragraph three of the syllabus. Such failure constitutes a waiver of the right to raise the error on appeal. *Warren, supra*. Because mother failed to raise the choice of law issue in her motion to enforce, it is waived.  In any event, the court did not find the contract to be unenforceable under Ohio law.  It simply exercised its discretion not to enforce it.

**{¶70}** The 2005 separation agreement included several financial provisions.  It provided that in any future divorce case, father would be liable for all mother's attorney fees and her living expenses until the divorce was final. The agreement also included a

18

provision for payment of a $150,000 advance of the division of the parties' property. This payment was to be in addition to father's obligation to pay mother's attorney fees. Mother argues the financial provisions of the separation agreement were enforceable against father. However, the separation agreement also provided that it "may be offered in evidence in any [divorce] suit, and *if acceptable to the Court*, shall be incorporated by reference in the decree that may be granted in such suit." (Emphasis added.)

**{¶71}** In the judgment denying mother's motion to enforce, the court found that, since the time the parties signed the separation agreement, the parties have had a third child, the son. The court also found that, since the execution of the separation agreement, there has been a significant change in the parties' financial circumstances. In 2005, when the separation agreement was executed, father was employed as a medical resident earning $40,000/year with prospects of earning $180,000/year. However, as of the hearing on the motion, the marital residence was in foreclosure and the amount owed on the mortgage was in excess of the current market value. As a result, the trial court decided not to enforce the separation agreement.

**{¶72}** Moreover, the language used in the separation agreement providing that it would be enforced only if the court finds it to be "acceptable" demonstrates the parties intended to give the court discretion in determining whether to enforce the agreement.

**{¶73}** The reasons articulated in the court's judgment entry demonstrate that the court exercised its discretion in not adopting the separation agreement. Because the court's decision was based on reason and the record, we cannot say the trial court abused its discretion in not enforcing the parties' separation agreement.

{¶74} Mother's second assignment of error is overruled.

{¶75} For her third assignment of error, mother contends:

{¶76} "The Trial Court committed prejudicial error by not removing Guardian Ad Litem Pamela [sic] Harris from the case and by not striking her testimony from the record.

{¶77} This court has held that a trial court's ruling on a motion to remove a guardian ad litem is reviewed for an abuse of discretion. *Meyers v. Hendrich*, 11th Dist. Portage No. 2009-P-0032, 2010-Ohio-4433, ¶21.

{¶78} Mother argues the trial court erred in not removing Ms. Harris as guardian or striking her testimony because she offered to testify for father in his criminal trial, in violation of R.Sup. 48(D)(2). That rule provides that a guardian ad litem shall maintain independence, objectivity, and fairness as well as the appearance of fairness in dealings with parties and professionals.

{¶79} However, mother does not reference any evidence in the record that shows that Ms. Harris offered to testify for father or that she in fact testified for him. In fact, Ms. Harris testified that father's criminal defense attorney asked her to testify about a video she had seen, but she declined.

{¶80} Next, mother argues the fact that Ms. Harris had a conversation with her at court on the day of father's criminal trial shows her bias. However, Ms. Harris testified she merely said "hello" to mother because she had already said "hello" to father and wanted to be fair to both. Mother admitted Ms. Harris told her she was only at the trial to observe and take notes for the divorce case. Thus, there is no evidence Ms. Harris acted with any bias or unfairness with respect to mother.

{¶81} Mother next argues that, because Ms. Harris did not file a written report with the court regarding a conflict between her recommendation and the girls' wishes, as required by Sup.R. 48(D)(8), she violated that rule. Mother argues that if Ms. Harris had filed such a report, she would have had more time to find "a better expert witness" than Dr. Darnell. However, violations of the Rules of Superintendence are not grounds for reversal. The Supreme Court of Ohio has held:

{¶82} [The] "Rules of Superintendence are designed (1) to expedite the disposition of both criminal and civil cases in the trial courts of this state, while at the same time safeguarding the inalienable rights of litigants to the just processing of their causes; and (2) to serve that public interest which mandates the prompt disposition of all cases before the courts." *State v. Singer*, 50 Ohio St.2d 103, 109-110 (1977).

{¶83} Further, the Rules of Superintendence

{¶84} are not the equivalent of rules of procedure and have no force equivalent to a statute. They are purely internal housekeeping rules which are of concern to the judges of the several courts but create no rights in individual defendants. *State v. Gettys*, 49 Ohio App.2d 241, 243 (3d Dist.1976). *Accord State v. Navedo*, 11th Dist. Lake No. 2007-L-094, 2008-Ohio-2324, ¶18 * * *.

{¶85} In any event, mother concedes she retained her own expert, Dr. Darnell. Moreover, the record is silent as to who mother would have allegedly retained if she had

21

been provided written notice of the difference between Ms. Harris' recommendations and the girls' wishes. Thus, mother failed to prove prejudice.

**{¶86}** We therefore hold the trial court did not abuse its discretion in denying mother's motion to strike and to exclude the guardian's testimony.

**{¶87}** Mother's third assignment of error is overruled.

**{¶88}** For her fourth and final assignment of error, mother alleges:

**{¶89}** "The Trial Court abused its discretion in assessing credibility of Appellant and witness Mawra Sadalla."

**{¶90}** Mother argues the trial court abused its discretion in finding father and mother's friend Marwa Sadalla to be credible witnesses. However, this court has repeatedly held that "[w]itness credibility rests solely with the finder of fact." *River Oaks Homes, Inc. v. Twin Vinyl, Inc.*, 11th Dist. Lake No. 2007-L-117, 2008-Ohio-4301, ¶27. Thus, "the finder of fact is entitled to believe all, part, or none of the testimony of any witness." *Id.*

**{¶91}** As a result, the trial court was entitled to find father and Ms. Sadalla to be credible witnesses. While mother points out certain alleged inconsistencies in father's testimony and an alleged financial relationship between Ms. Sadalla's husband and father, the trial court obviously found these issues to be insignificant in assessing the credibility of these witnesses. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the trial court was entitled to make this call. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. We thus hold the trial court did not abuse its discretion in finding these witnesses to be credible.

**{¶92}** Mother's fourth assignment of error is overruled.

**{¶93}** Father asserts two assignments of error for his cross-appeal. For his first assigned error, he alleges:

**{¶94}** "The trial court abused its discretion when it failed to offset Plaintiff/Cross-Appellants' hypothetical social security benefit against his Ohio Public Employee's Retirement Service pension plan."

**{¶95}** This court has held:

**{¶96}** "Generally, pension or retirement benefits earned during the course of a marriage are marital assets to be considered when dividing marital property. *Hoyt v. Hoyt*, 53 Ohio St.3d 177 (1990) * * *. An appellate court applies an abuse of discretion standard of review to a trial court's decision regarding the division of retirement assets. *Levine v. Levine*, 4th Dist. Washington No. 98 CA 34, 1999 Ohio App. LEXIS 4209 (Sept. 3, 1999)." *DeChristefero v. DeChristefero*, 11th Dist. Trumbull No. 2001-T-0055, 2003-Ohio-3065, ¶28.

**{¶97}** Father presented two reports from Pension Evaluators regarding his retirement benefit. The first report concluded the present value of his PERS pension with Robinson Memorial Hospital, is $119,129. The second report concluded the present value of his "hypothetical social security benefit," if he had worked in the private sector during the marriage, is $122,315.

**{¶98}** Father argues that the trial court abused its discretion by not offsetting his hypothetical social security benefit against his PERS benefit pursuant to the rule adopted by the Superior Court of Pennsylvania in *Cornbleth v. Cornbleth*, 397 Pa.

Super. 421 (1990) and this court's decision following *Cornbleth* in *Thompson v. Thompson*, 11th Dist. Portage No. 2010-P- 0058, 2011-Ohio-6689.

**{¶99}** This court in *Thompson* noted that, unlike PERS, state courts cannot divide social security benefits pursuant to federal statute. *Id*. at ¶18. This court noted this can create an inequity when one spouse contributes to the social security system and the other spouse contributes to a government pension system like PERS. *Id*. Public employees contributing to a pension system like PERS may be penalized because their pension is marital property subject to division, while their spouse's social security is not marital property under federal statute. *Id*.

**{¶100}** In *Thomspon*, this court stated:

**{¶101}** "To facilitate a process of equating [public pension] participants and Social Security participants we believe it will be necessary to compute the present value of a Social Security benefit had the [public pension] participant been participating in the Social Security system. This present value should then be deducted from the present value of the [public] pension at which time a figure for the marital portion of the pension could be derived and included in the marital estate for distribution purposes. This process should result in equating, as near as possible, the two classes of individuals for equitable distribution purposes." *Id*. at ¶15, quoting *Cornbleth, supra*, at 427.

**{¶102}** Thus, father argues that before his pension can be divided as marital property, the present value of his hypothetical social security benefit, which he would

24

have received if contributing to social security, should be deducted from the present value of his public pension benefit to determine the marital portion of the pension. Under father's argument, the trial court should have subtracted his hypothetical social security benefit, i.e., $122,315, from his OPERS benefit, i.e., $119,129, leaving $0.00 as the amount of his pension subject to division.

{¶103} However, the Superior Court of Pennsylvania later declined to follow its holding in *Cornbleth* in *McClain v. McClain*, 693 A.2d 1355 (1997), because the wife in *McClain* had no pension. The court held: "Clearly, it would be inequitable under the facts of this case to credit Husband with the value of hypothetical social security contributions when Wife, unlike the [wife] in *Cornbleth*, * * * has no appreciable social security benefits of her own to balance against such a credit. *Id.* at 359.

{¶104} We note that in *Thompson*, like *Cornbleth*, one spouse had contributed to social security, while the other had an STRS benefit. Thus, this case is distinguishable from *Thompson* and *Cornbleth* because mother has no social security benefits. Pursuant to *McClain*, *supra*, because mother has no pension of her own, the trial court did not abuse its discretion in deciding not to credit father with the value of his hypothetical social security benefit.

{¶105} Father's first assignment of error is overruled.

{¶106} For his second and final assigned error, father argues:

{¶107} "The trial court abused its discretion in granting a downward deviation of Wife's child support obligation."

{¶108} This court reviews an award of child support for an abuse of discretion. *Holt v. Holt*, 11th Dist. Trumbull No. 2002-T-0147, 2004-Ohio-4536, ¶11.

{¶109} Father argues the trial court abused its discretion in allowing a downward deviation of mother's child support obligation. We disagree.

{¶110} Based on father's loss of his job, effective May 2012, the trial court imputed minimum wage to him and imputed $29,559 to mother based on her part-time, minimum-wage job working for her brother and a vocational assessment presented at trial. Using these figures, mother's guideline child support obligation was $633/month. The trial court granted a downward deviation, reducing her obligation to $375/month. In support of this deviation, the court cited mother's lack of income and the costs she will incur for counseling and supervised visitation. We note that, although father lost his current job following his conviction of domestic violence, his potential earning capacity is greater than that of mother, given her limited English language skills and her minimal prior employment.

{¶111} Since the court justified its deviation in the amount of child support owed by mother by stating its reasons, which are supported by the record, we cannot say the court abused its discretion.

{¶112} Father's second assignment of error is overruled.

{¶113} For the reasons stated in the opinion of this court, appellant's and cross-appellant's assignments of error are overruled. It is the judgment and order of this court that the judgment of the Portage County Court of Common Pleas, Domestic Relations Division, is affirmed.

TIMOTHY P. CANNON, P.J.,

THOMAS R. WRIGHT, J.,

26

concur.