[Cite as *In re D.E.*, 2021-Ohio-524.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| [D.E. | : | No. 20AP-83 |
| | | (C.P.C. No. 18JU-5647) |
| S.L., Mother, | : | |
| | | (REGULAR CALENDAR) |
| Appellant]. | : | |
| In the Matter of: | : | |
| [R.P. et al., | : | No. 20AP-85 |
| | | (C.P.C. No. 18JU-5648) |
| S.L., Mother, | : | |
| | | (REGULAR CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on February 25, 2021

**On brief:** *Steven Thomas D. Potts*, for appellee Franklin County Children Services.

**On brief:** *Anzelmo Law*, and *James A. Anzelmo*, for S.L.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

DORRIAN, P.J.

{¶ 1} Appellant, S.L. ("appellant"), mother of four minor children, D.E., Jr., R.P., C.P., and T.P. (collectively, "the children"), appeals the January 22, 2020 decisions and judgment entries of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which granted permanent custody of the children to appellee, Franklin County Children Services ("FCCS"). For the following reasons, we reverse.

## I. Facts and Procedural History

{¶ 2} Prior to the opening of the cases presently before us, as will be referenced briefly herein, appellant and the children had been involved in prior cases with FCCS before the juvenile court. The two cases before us now also involve FCCS. In one, FCCS sought permanent custody of D.E., Jr., minor child of D.E., Sr. and appellant. In the other case, FCCS sought permanent custody of R.P., C.P., and T.P., minor children of X.P.[1] and appellant.[2] On May 10, 2018, FCCS filed a complaint alleging D.E., Jr. was a dependent child pursuant to R.C. 2151.04(C). On the same date, FCCS filed a complaint in a separate case alleging R.P., C.P., and T.P. were dependent children pursuant to R.C. 2151.04(C).[3] On May 11, 2018, the juvenile court magistrate ("magistrate") filed orders granting FCCS temporary custody of the children. On the same date, the magistrate filed findings of fact and conclusions of law finding FCCS made reasonable efforts to prevent removal of the children.

{¶ 3} On June 15, 2018, the magistrate held a hearing at which appellant was present but was not at that time represented by counsel. At the hearing, the magistrate inquired of appellant for purposes of determining compliance with the Indian Child Welfare Act ("ICWA") as follows:

> [Magistrate]: [D]o you have any Native American heritage in
> your background?
> [Appellant]: Cherokee.

---

[1] We note that X.P. and one of the children have the same initials. To avoid confusion, we shall refer to the father of R.P., C.P., and T.P. as "X.P."

[2] We note the record reflects X.P. was incarcerated at the time of the permanent custody hearing. D.E., Sr. was not present at the permanent custody hearings and did not participate throughout the history of the case. Neither X.P. nor D.E., Sr. filed notices of appeal from the judgments before us.

[3] Pursuant to Evid.R. 201, a court, including an appellate court, may take judicial notice of a fact not subject to reasonable dispute that is " 'either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' " *See State ex rel. Brime v. McIntosh*, 10th Dist. No. 19AP-70, 2019-Ohio-4019, ¶ 28, quoting Evid.R. 201(B); *State v. Murphy*, 10th Dist. No. 12AP-952, 2013-Ohio-5599, ¶ 23; *State ex rel. Coles v. Granville*, 116 Ohio St.3d 231, 2007-Ohio-6057, ¶ 20, citing *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir.1992), quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991) (citing *Liberty Mut. Ins. Co.* for the proposition that a " 'court may take judicial notice of a document filed in another court "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings" ' "). We take judicial notice of the fact that complaints involving the same parties alleging dependency pursuant to R.C. 2151.04(C) were previously filed in the juvenile court in case Nos. 18JU-1651 and 18JU-1653 on February 12, 2018. At the May 11, 2018 hearing, the assistant prosecutor for the state of Ohio stated: "The State's asking for a dismissal on 18JU-1653 as well as 18JU-1651. Parents have not been served and [Indian Child Welfare Act] has not been done either, so we are unable to move forward on those two complaints. The State would request that we move forward on the new complaints and all orders be maintained." (May 11, 2018 Tr. at 2.)

[Magistrate]: All right, are you a member?

[Appellant]: No.

(June 15, 2018 Tr. at 4.)  On June 20, 2018, the magistrate filed an entry reflecting that appellant was sworn in for "Native American heritage history."  On June 21, 2018, the magistrate reappointed Brian L. Herzberger as the children's guardian ad litem ("GAL"), having previously served as GAL to the children from his appointment in prior cases on June 9, 2017.

{¶ 4}   On August 20, 2018, FCCS filed semi-annual reviews and case plans in both cases.   On August 23, 2018, the magistrate filed decisions finding the children to be dependent, pursuant to R.C. 2151.04(C), and ordering the children be committed temporarily to the custody of FCCS pursuant to R.C. 2151.353(A)(2).  The entries noted temporary custody would continue until further notice of the court.  The juvenile court adopted the magistrate's decisions.

{¶ 5}   On January 4, 2019, FCCS filed motions for permanent custody of the children.  On January 7, 2019, the juvenile court filed notice of the permanent custody hearing.  On February 6, 2019, the magistrate filed findings of fact and conclusions of law finding FCCS made reasonable efforts to finalize a permanency plan. On March 5 and July 8, 2019, FCCS filed semi-annual reviews.

{¶ 6}   On March 8, 2019,   entries were filed granting FCCS's request for a continuance in order to perfect service.  On March 8, 2019, an entry was filed granting the GAL's request for a continuance to complete his investigation.  On April 16, 2019,  entries were filed granting the GAL's request for a continuance to review the children's file.  On May 22, 2019, an entry was filed granting the GAL's request for a continuance due to a conflict.

{¶ 7}   On July 17, 2019, the GAL filed a report.  On July 18, 2019, the juvenile court held a pretrial hearing.  On July 19, 2019, the juvenile court filed an entries reflecting its decision to grant appellant's request for a continuance to complete discovery.  On the same entry, below the date of the new hearing on the motion for permanent custody, the following notice was provided: "This is a Permanent Custody Hearing. If the Court grants Permanent Custody, ALL your parental rights and privileges are terminated, and you will have no legal rights to the child/ren."  (Emphasis sic.)  On October 29, 2019, FCCS refiled

motions for permanent custody of the children; however, these motions were dismissed by FCCS, and FCCS pursued only the motions for permanent custody filed on January 4, 2019.

{¶ 8} On December 2, 2019, the juvenile court held a hearing on the motion for permanent custody. Appellant was not present at the hearing. The juvenile court denied a request by appellant's counsel to continue the hearing.

{¶ 9} At the hearing, Kristie Marshall, a caseworker for FCCS, testified that, on two occasions, she had been assigned to cases involving the children. Marshall had first been assigned to a case involving the children when it had been brought as "[v]oluntary case openings protective service," or "VPS" case. (Dec. 2, 2019 Tr. at 13.) According to Marshall, VPS meant that "the parent," in this matter, appellant, "signed an agreement" for FCCS to receive custody of children "for a certain period of time." (Dec. 2, 2019 Tr. at 13.) Beginning August 1, 2017, R.P., C.P., and T.P. were placed in FCCS's custody under a 30-day VPS agreement with appellant to alleviate homelessness. It appears the VPS continued through November 2017.

{¶ 10} Following the initial VPS case, appellant had been linked with Friends of the Homeless, a shelter organization, and had been staying at a shelter. FCCS secured housing for appellant; however, appellant declined the housing. As a result of her decision to decline housing, the shelter informed appellant she had to leave the shelter.[4] Appellant signed an agreement with the shelter stating she would not reapply for shelter for a period of 90 days.

{¶ 11} According to Marshall, after being removed from the shelter, appellant stayed at a friend's home with the children until they were removed from that home. As a result of this removal, appellant and the children were rendered homeless and were living in a car. Thereafter, appellant brought the children to FCCS on January 20, 2018. Due to homelessness, appellant was unable to wash the family's clothes or provide for other basic needs for the children. Appellant entered into another VPS to relinquish custody of the children to FCCS for a period of 30 days. Marshall testified that appellant relinquished her children to FCCS on January 20, 2018. She was careful not to state that the children had been removed because the relinquishment was pursuant to appellant's VPS. Marshall testified she was assigned the present cases involving the children in February 2018.

---

[4] We note that Marshall's testimony on this point is unclear. As the complaints in these cases were refiled on May 11, 2018, we have no other evidence in the record to which to look for clarity.

{¶ 12} According to Marshall, FCCS received a temporary order of custody for the children on February 16, 2018. The children remained in the uninterrupted custody of FCCS from that date through the permanent custody hearing. At the time of the permanent custody hearing, D.E., Jr. was nine years old, R.P. was six years old, C.P. was five years old, and T.P. was four years old.

{¶ 13} Marshall testified that in January 2018, after FCCS entered into the VPS with appellant, the children were placed with N.C., a foster parent. On November 20, 2018, the children were placed with a relative of appellant. On December 31, 2018, due to a disruption, the children were moved and separated. T.P. returned to N.C., whereas D.E., Jr., R.P., and C.P. were moved to a foster home in Galion, Ohio. In April 2019, D.E., Jr. was placed at Fox Run Center ("Fox Run"), a residential treatment facility for children. In July 2019, R.P. was placed at St. Vincent's Family Center ("St. Vincent"), a residential treatment facility for children. C.P. remained at the foster home in Galion.

{¶ 14} Based on her observations, Marshall testified the interactions between C.P. and C.P.'s foster parents were appropriate and they were bonded to one another. C.P.'s foster parents took very good care of C.P. and C.P. was affectionate toward the foster parents. C.P.'s foster home was a potential adoptive placement for C.P.

{¶ 15} Marshall stated that R.P. was ready to be discharged from residential treatment at St. Vincent's.[5] T.P.'s foster home was a potential adoptive placement for T.P. D.E., Jr. had no projected discharge date from Fox Run. Marshall believed D.E., Jr. needed to continue residential treatment.

{¶ 16} There were no plans to reunite the children in the same foster home. Marshall testified that even after their release from residential treatment, D.E., Jr. and R.P. would not be able to return to their prior foster homes. However, the semi-annual review indicated that R.P. had been returned to the home of the foster family who cared for C.P. Marshall was unaware of any adoptive placements in which all the children would remain together. Three of the children were able to verbalize their wishes for placement; those three stated they wished to return to appellant.

{¶ 17} Marshall testified that D.E., Sr. had not participated with the case during its pendency, had not visited D.E., Jr., and had not been in contact with FCCS by telephone or

---

[5] We note that in the semi-annual review filed on January 10, 2020 infra, the FCCS caseworker stated that "[R.P.] was discharged from St. Vincent's and moved back to [the] former foster home on 12/6/2019." (Jan. 10, 2020 Semi-Annual Review at 4.)

e-mail. X.P. had not been involved during the pendency of the case. FCCS received written communication from X.P. in which he stated he was incarcerated until 2025, though he wished he had been able to be involved. X.P. had no contact with the children. Marshall testified it was her understanding that X.P. was indeed incarcerated, with his earliest possible release date in 2025.

{¶ 18} Marshall described the elements of the case plan with which appellant was required to comply: (1) provide for the basic needs of the children, including shelter, food, clothing, education, medical, and any special needs, (2) obtain legal employment, and (3) obtain legal housing. According to Marshall, appellant failed to maintain consistent contact with FCCS during the pendency of the matter. Specifically, Marshall testified that "[t]here will be periods of time where [appellant] wouldn't contact me or her contact information would change via [sic] phone number or an address where she could be found and she'll just come back out of the blue." (Dec. 2, 2019 Tr. at 20.) Marshall had repeatedly informed appellant of her case plan objectives throughout the pendency of the matter, explaining that compliance was necessary in order to return the children to her custody.

{¶ 19} Marshall described the various efforts FCCS had undertaken to assist appellant in meeting case plan objectives. As previously noted, when the cases were initially opened, appellant was linked with Friends of the Homeless. Later, appellant was linked with another organization, Family to Family. Marshall made two community service worker referrals in order to help appellant secure housing. Appellant had an open case with a community service worker but had not been consistent in attending meetings. FCCS provided appellant with monthly bus passes and offered Greyhound bus passes for visits to Fox Run. Appellant had not accepted any offer for transportation to Fox Run to visit D.E., Jr.

{¶ 20} Regarding appellant's case plan objective to provide for the basic needs of the children, including their medical and special needs, Marshall described the children's various medical and psychological issues. The children had behavioral issues prior to being placed in foster care. All the children had sleeping issues and were receiving counseling. D.E., Jr. had been diagnosed with attention deficit hyperactivity disorder ("ADHD") and was receiving six medications to address impulse control and sleep issues. R.P. had also been diagnosed with ADHD and was receiving prescribed medications to treat ADHD and sleep issues. It was Marshall's opinion that appellant downplayed the children's medical

and special needs, failing to acknowledge such needs despite the fact they had been diagnosed.

{¶ 21} Further, according to Marshall, appellant was not able to provide for the children's basic needs because she consistently depended on FCCS to provide transportation, even to visits with the children. Appellant had not provided clothing, snacks, or hygiene products to the children at visits, despite being encouraged to do so.

{¶ 22} Marshall described appellant's visits with the children throughout the history of the cases as "[v]ery inconsistent" and "very sporadic" at times. (Dec. 2, 2019 Tr. at 25.) From May 30, 2018 through December 2018, appellant did not visit the children. According to Marshall, appellant had not visited the children who were in residential treatment facilities, or attended any of their counseling sessions, despite being offered transportation to those facilities by FCCS. Appellant had accepted an arrangement to visit R.P. at St. Vincent's for Thanksgiving dinner, but failed to attend.

{¶ 23} Through her observations of appellant's visits with the children, Marshall described appellant and the children as bonded. Appellant's interactions with the children were appropriate and her supervision of them was adequate over the duration of the visit. However, Marshall did not believe appellant demonstrated an ability to care for the children because of her lack of consistency and "[s]he just doesn't participate." (Dec. 2, 2019 Tr. at 43.)

{¶ 24} Next, with regard to the case plan objective to obtain stable housing, Marshall stated appellant had not had stable housing throughout the pendency of the matter. In order to be compliant with the case plan requirements for obtaining stable housing, appellant was required to obtain independent housing that she was able to sustain by means of a legal source of income or housing assistance without depending on another person. Over the history of the cases, appellant had lived in at least five different places of which Marshall was aware including: with her niece for a period of a couple months; at a shelter in Lancaster; at a hotel; with an unidentified male for about one month, during which time she would not allow Marshall to visit where she was staying; and, beginning in September 2019 through the permanent custody hearing, at her boyfriend's residence.

{¶ 25} Marshall had visited appellant at her boyfriend's residence. According to Marshall, the residence was "appropriate" with working utilities and no visible hazards. (Dec. 2, 2019 Tr. at 24.) Appellant's boyfriend, his three children, and appellant resided at the residence. There were three bedrooms. Marshall stated that "[o]ne bedroom would be

for the girls and the other one will be for the boys and then the boyfriend and [appellant]." (Dec. 2, 2019 Tr. at 24-25.) Considering the children's behavioral issues, the challenges of entering a new environment, and appellant's boyfriend's lack of prior interactions with the children, Marshall believed it would be inappropriate for the children to reside in such close proximity to appellant's boyfriend's three children at the residence.

{¶ 26} Marshall met appellant's boyfriend on a visit to the residence. At the time, appellant's boyfriend indicated he was willing to have the children move into the residence with him and his children. However, one week prior to the permanent custody hearing, Marshall received an e-mail from appellant's boyfriend indicating he was no longer willing to have the children reside at the residence with him and his children. Marshall was not able to meet appellant's boyfriend's children because they were in school at the time of her visit. Marshall did not consider appellant's housing to be stable at the time of the permanent custody hearing because appellant had not resided at her boyfriend's residence for a sufficient amount of time when considered in conjunction with her history of frequent relocations, the fact that it was not independent housing, and the fact that she did not have stable, legally obtained income sufficient to otherwise sustain housing and provide for the children.

{¶ 27} Finally, Marshall did not believe appellant had met the case plan requirement to obtain stable employment. Two weeks prior to the permanent custody hearing, appellant informed Marshall she had started working, but had not provided paystubs or any documentation to support proof of employment. Prior to her present employment, appellant had worked for periods of time at other jobs, but not in an "ongoing or consistent" fashion. (Dec. 2, 2019 Tr. at 30.) Marshall was unable to describe appellant's complete employment history over the duration of the matter because there were periods of time that appellant would not be in contact with FCCS. Marshall described appellant's progress on her case plan requirement to maintain a stable, legal source of income as "[v]ery inconsistent, minimal." (Dec. 2, 2019 Tr. at 45.)

{¶ 28} Herzberger testified he was first appointed as the children's GAL on June 9, 2017 on prior cases involving the same parties. Herzberger served as the children's GAL throughout the pendency of the motions for permanent custody. In response to being asked when he first met the children, Herzberger testified he "visited them prior to filing my report, which I filed on July 17th of this year and it was just a little before that that I -- I visited with them." (Dec. 2, 2019 Tr. at 49.) When asked what his visits had been like,

Herzberger responded "I visited with [R.P.] and [C.P.] and they were at their foster placement and I can't remember the city, but -- and talked with both of them there. I visited with [D.E., Jr.] at Fox Run and I mis -- visited with [T.P.] at [T.P.'s] foster placement." (Dec. 2, 2019 Tr. at 49.)

{¶ 29} Regarding his contact with appellant, Herzberger testified that "I've had no interaction with [appellant]. I believe she called my office once and left a message that she was gonna [sic] return the call; I believe I've never heard from her."  (Dec. 2, 2019 Tr. at 50.)  Herzberger admitted this meant he had never been present at appellant's visits with any of the children to observe her interaction with them. Herzberger stated that "[w]ith [appellant's] visits being so sporadic, I was unable to ever schedule one."  (Dec. 2, 2019 Tr. at 51.)  Regarding his contact with D.E., Sr. and X.P., Herzberger testified he had "never had any communication with any of the fathers."  (Dec. 2, 2019 Tr. at 50.)  Herzberger stated his report contained a log of who he had spoken with and the visits he had made in this matter.

{¶ 30} Next, Herzberger discussed his interaction with each of the children, including their articulated wishes regarding placement, if any.  Herzberger was "unable to elicit a response" from T.P. other than a statement that T.P. enjoyed living at the foster home. (Dec. 2, 2019 Tr. at 50.) Herzberger was unable to determine whether T.P. understood the permanency of adoption.  C.P. enjoyed visiting with appellant, and wished to be returned to live with appellant.

{¶ 31} According to Herzberger, R.P. enjoyed visits with appellant and wanted to be placed with her. R.P. informed Herzberger that appellant "tells [R.P.] that the two of them are going to go together and * * * get a house together." (Dec. 2, 2019 Tr. at 50.)  Herzberger met with D.E., Jr. in the presence of D.E., Jr.'s clinician because, according to Herzberger, it was the first time they had met and D.E., Jr. wanted someone familiar to be present during the conversation with Herzberger.

{¶ 32} Herzberger stated he had reviewed all the discovery in the matter. When asked whether he had any understanding of the children's medical or special needs, Herzberger responded:

> I haven't looked at it lately, to be honest with you, no, I mean, with -- with the parents not being involved and [appellant] never contacting me, you know, that wasn't a real concern for my -- about whether [appellant] would be able to meet any needs of the children because the parents were just -- well, with

> the one parent being incarcerated and the other one at the time I had no idea where he was, that wasn't a major concern for me about whether they would or not be able to meet any medical needs or special needs because they were simply not involved.

(Dec. 2, 2019 Tr. at 53-54.) Herzberger was unable to identify how long the children had been in FCCS's custody, but stated it had been for more than 12 out of the last 22 months.

{¶ 33} Herzberger testified the children needed a legally secure and permanent placement, and recommended the court grant the motion for permanent custody. Herzberger stated the children could not be reunited with appellant within a reasonable time because:

> [Appellant] never contacted me other than one call very recently that she was gonna [sic] call back. And once I make initial contact with the parent as best I can at the address, my practice is that it's up to the parents to be the one to get in touch with me so that I can see whether they're invested in the case or not and I can't see that any of the parents are invested in this case whatsoever.

(Dec. 2, 2019 Tr. at 57.) With regard to appellant's housing situation, Herzberger testified as follows:

> [FCCS Attorney]: Do you have a concern with reuniting the children with [appellant] based upon housing - -
>
> [Herzberger]: Absolutely.
>
> [FCCS Attorney]: - her ability to provide housing?
>
> [Herzberger]: Based in -- based on what I've heard from caseworker testified to today, yes, I would.
>
> [FCCS Attorney]: And your independent review of the records?
>
> [Herzberger]: Yes.

(Dec. 2, 2019 Tr. at 57.)

{¶ 34} On cross-examination, Herzberger confirmed he had never visited appellant's current housing situation or spoken with her boyfriend at their residence. Herzberger testified the children were bonded to appellant based on their comments about enjoying visiting with her. Herzberger was unable to testify as to whether the children were bonded with one another. However, he believed it was in the children's best interest for all four to be placed together.

{¶ 35} Herzberger testified he did not make any attempts to be present for visits between appellant and the children because he "never knew when she was or wasn't gonna [sic] show up." (Dec. 2, 2019 Tr. at 59-60.) Herzberger was informed that appellant was visiting the children, though he "heard that [the visits] were sporadic." (Dec. 2, 2019 Tr. at 60.) Herzberger responded "[n]o" when asked whether he was "aware that [FCCS] would have all four children come visit together and let them visit even when [appellant] wasn't present." (Dec. 2, 2019 Tr. at 60.)

{¶ 36} On January 10, 2020, FCCS filed semi-annual reviews. On January 22, 2020, the juvenile court filed decisions and judgment entries granting FCCS's motions for permanent custody.

## II. Assignments of Error

{¶ 37} Appellant appeals and assigns the following four assignments of error for our review:

> [I.] The trial court erred by holding the hearing on children services' permanent custody petition without [appellant] being present, in violation of [appellant's] due process rights under the due process clause of the Fourteenth Amendment to the United States Constitution, and her confrontation rights under the Sixth Amendment to the United States Constitution.
>
> [II.] The trial court plainly erred by admitting the testimony of the guardian ad litem.
>
> [III.] The trial court plainly erred by concluding that the Indian Child Welfare Act did not apply to the parental rights termination proceedings.
>
> [IV.] Children services failed to establish, by clear and convincing evidence, that it should be given permanent custody of [appellant's] children.

## III. Applicable Law—Parenting Is a Fundamental Right

{¶ 38} "The right to parent one's child is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution." *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6. *See also In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("[T]he right to raise one's children is an 'essential' and 'basic civil right.' "). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.,* quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982).

"Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶ 39}  However, the state has broad authority to intervene to protect children from abuse and neglect.  *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, citing R.C. 2151.01. An award of permanent custody which terminates parental rights, is an " 'alternative of last resort and is only justified when it is necessary for the welfare of the children.' "  *In re C.G.*, 10th Dist. No. 13AP-632, 2014-Ohio-279, ¶ 28, quoting *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 26.

## IV. First Assignment of Error—Denial of Continuance

{¶ 40}  In her first assignment of error, appellant asserts the juvenile court erred by holding the permanent custody hearing outside the presence of appellant in violation of her constitutional rights.  Specifically, appellant contends the juvenile court erred by denying her counsel's request for a continuance on the day of the permanent custody hearing.

{¶ 41}  We review a juvenile court's decision to deny a continuance in a permanent custody case for abuse of discretion.  *In re K.J.*, 10th Dist. No. 17AP-457, 2018-Ohio-471, ¶ 17; *In re A.L.*, 10th Dist. No. 15AP-1040, 2016-Ohio-3189, ¶ 20; *In re J.B.*, 10th Dist. No. 08AP-1108, 2009-Ohio-3083, ¶ 26; *In re B.G.W.*, 10th Dist. No. 08AP-181, 2008-Ohio-3693, ¶ 23.  An abuse of discretion connotes a decision that is unreasonable, arbitrary or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).  However, no court possesses the authority within its discretion to commit an error of law.  *Badescu v. Badescu*, 10th Dist. No. 18AP-947, 2020-Ohio-4312, ¶ 9; *In re L.D.*, 10th Dist. No. 12AP-985, 2013-Ohio-3214, ¶ 8.

{¶ 42}  " 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' "  *J.B.* at ¶ 26, quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).  In reviewing a trial court's decision to deny a continuance an appellate court conducts a balancing test, "weigh[ing] any potential prejudice to the [movant] against a court's right to control its own docket and the public's interest in the efficient dispatch of justice."  *State v. Woods*, 10th Dist. No. 09AP-667, 2010-Ohio-1586, ¶ 24, citing *State v. Unger*, 67 Ohio St.2d 65, 67 (1981).  In *Unger*, the Supreme Court of Ohio listed the following factors to be

considered by a court in conducting the balancing test: (1) the length of the requested delay, (2) whether other continuances have been requested and granted, (3) the inconvenience to the parties, witnesses, opposing counsel, and the court, (4) whether the requested delay is for legitimate reasons or is dilatory, purposeful, or contrived, (5) whether the movant contributed to the circumstances giving rise to the request for a continuance, and (6) any other relevant factors, depending on the unique circumstances of each case. *Unger*, 67 Ohio St.3d at 67. *See K.J.* at ¶ 17.

{¶ 43} At the December 2, 2019 custody hearing, counsel for appellant requested a continuance:

> [Appellant's trial attorney]: I would just like to ask for a continuance on the record. Obviously, my client isn't here. I had last contact with her yesterday afternoon about this time by phone. She was expected to be here. I tried to text her this afternoon and call her. I've received nothing back yet, so I do not know why she is not here. It's my understanding that she did contact the caseworker with a (sic) email this morning, which my -- oh.
>
> [FCCS caseworker]: Not this morning. It was Wednesday.
>
> [Appellant's trial attorney]: Oh, Wednesday.
>
> [FCCS caseworker]: Uh-huh (affirmative response).
>
> [Appellant's trial attorney]: I -- I don't know, Your Honor.
>
> [Judge]: Understood, counsel.
>
> [Appellant's trial attorney]: Thank you.
>
> [Judge]: I appreciate your position, the Court will overrule your request.

(Dec. 2, 2019 Tr. at 8-9.) In the January 22, 2020 decisions and judgment entries, the juvenile court stated: "[Appellant] failed to appear. The Court denied [appellant's] Counsel's request for a continuance." (Decision at 2.)

{¶ 44} Here, the record is clear that appellant failed to appear on the day of the permanent custody hearing. Loc.R. 2 of the Court of Common Pleas of Franklin County, Division of Domestic Relations, Juvenile Branch ("Loc.Juv.R.") provides that "[n]o case will be continued on the day of hearing except for good cause shown." Although the juvenile court did not articulate reasons in support of its decision to deny the continuance, it did

note in its decision that the motions for permanent custody in these cases were filed on January 4, 2019, nearly 11 months before the permanent custody hearing on December 2, 2019.[6]

{¶ 45} Citing *In re Sheffey*, 167 Ohio App.3d 141, 2006-Ohio-619 (11th Dist.), appellant argues the trial court's decision to deny the request for a continuance was in error because appellant had a right to be present during a hearing pertaining to her parental rights. In *Sheffey*, a children services agency brought a complaint for dependency and neglect regarding a child who was born while the child's mother was serving a one-year prison sentence. The clerk did not serve the mother with a copy of the complaint, but did serve her with a copy of the judgment of the trial court granting the continuance of the dependency and neglect hearing. The mother, who remained incarcerated during the entirety of the case, was not transported to the hearing on neglect and dependency, nor was she appointed counsel or given notice of her rights or the allegations about her.

{¶ 46} After the trial court in *Sheffey* adjudicated the child dependent and neglected, the court appointed a public defender to represent the mother on the children services agency's motion for permanent custody of the child. Over one week prior to the hearing, the public defender, appointed as the mother's representative, filed a motion to continue the permanent custody hearing citing an inability to provide evidence in the mother's defense. The trial court denied the motion, arranged for the mother to be present at the permanent custody hearing, and granted the motion for permanent custody. On appeal, the court reversed, concluding that "[b]y denying the mother proper notice, a recitation of her rights, and proper participation in the proceedings, as well as by denying her a continuance, and failing to appoint her counsel during the hearing for neglect and dependency, the trial court did not comply with the basic constitutional requirements set forth in both the Ohio and United States Constitutions." *Id.* at ¶ 23.

{¶ 47} *Sheffey* is inapposite to the present matter. Unlike in *Sheffey*, there is no allegation in this matter that the juvenile court failed to provide appellant proper notice, appointed counsel, or recitation of her rights. More importantly, unlike in *Sheffey*, in which the mother's trial counsel provided a reason for the continuance, here, appellant's trial

---

[6] As previously noted, the record reflects FCCS filed motions for permanent custody on January 4, 2019. On October 29, 2019, FCCS refiled motions for permanent custody of the children. At the permanent custody hearing, counsel for FCCS stated that the October 29, 2019 motions indicated that the children had been in FCCS's custody for a consecutive period of 12 out of the prior 22 months. FCCS withdrew the October 29, 2019 permanent custody motions and elected to proceed on the January 4, 2019 motions.

counsel, who was present at the permanent custody hearing, had no explanation for appellant's absence. Indeed, on appeal, appellant advances no argument as to why she was absent or prevented from attending the hearing. Appellant's right to be present at the hearing was not violated; appellant simply failed to attend.

{¶ 48} Next, we consider the *Unger*, 67 Ohio St.2d 65, factors in light of the particular facts and circumstances of these cases. First, it is unclear on the record before us as to the length of the requested delay, though, as previously mentioned, the motions for permanent custody had been pending for nearly 11 months prior to the date of the permanent custody hearing. Second, there were several continuances related to the motions for permanent custody, though appellant made only one such request prior to the date of the hearing. It is important to note that in the July 19, 2019 entry granting appellant's request for a continuance prior to the date of the hearing, the juvenile court included, along with the date of the permanent custody hearing, the following notice to appellant: "This is a Permanent Custody Hearing. If the Court grants Permanent Custody, ALL your parental rights and privileges are terminated, and you will have no legal rights to the child/ren." (Emphasis sic.)

{¶ 49} Third, it is clear from the record that the FCCS caseworker, the GAL, the children's attorney, and counsel for FCCS were present and prepared to proceed with the hearing. Therefore, considering the fact that the request for a continuance was made on the day of the hearing, we find there would have been inconvenience to the parties, witnesses, opposing counsel, and the court had the request been granted. Fourth, we find appellant's counsel's request for a continuance was for a legitimate reason. Fifth, in the absence of any other facts in the record, we find appellant, through her unexplained absence, was responsible for creating the circumstances giving rise to the request for a continuance.

{¶ 50} As a result, considering the length of time the motions for permanent custody had been pending, the notice provided to appellant regarding the consequences of the permanent custody hearing, the inconvenience to the parties, and the fact that appellant's unexplained absence gave rise to the delay, we cannot find the juvenile court abused its discretion by denying appellant's counsel's request for a continuance. *See K.J.* at ¶ 31. Accordingly, we overrule appellant's first assignment of error.

**V. Third Assignment of Error—ICWA Compliance**

{¶ 51} For ease of discussion, we next address appellant's third assignment of error. In her third assignment of error, appellant asserts the juvenile court erred by holding the ICWA did not apply to the permanent custody proceedings.

{¶ 52} The ICWA establishes certain procedural safeguards intended to govern child custody proceedings involving Indian children.[7] *See Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989); *In re A.G.*, 8th Dist. No. 107600, 2019-Ohio-1345, ¶ 14, citing *In re L.R.D.*, 8th Dist. No. 107301, 2019-Ohio-178, ¶ 19.

{¶ 53} 25 U.S.C. 1903, defines "Indian" and "Indian child" pursuant to the ICWA, as follows:

> (3) "Indian" means any person who is a member of an Indian tribe * * *;
>
> (4) "Indian child" means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]

*See also* Ohio Adm.Code 5101:2-53-01. Furthermore, 25 C.F.R. 23.103 provides that ICWA applies when an Indian child is the subject of the following child custody proceedings:

> (a) ICWA includes requirements that apply whenever an Indian child is the subject of:
>
> (1) A child-custody proceeding, including:
>
> (i) An involuntary proceeding;
>
> (ii) A voluntary proceeding that could prohibit the parent or Indian custodian from regaining custody of the child upon demand; and
>
> (iii) A proceeding involving status offenses if any part of the proceeding results in the need for out-of-home placement of

---

[7] Congress provided that ICWA was enacted "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." 25 U.S.C. 1902. *See* 25 C.F.R. 23.3. The Supreme Court of the United States has stated that "canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians" and that "[s]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985).

> the child, including a foster-care, preadoptive, or adoptive placement, or termination of parental rights.
>
> (2) An emergency proceeding.
>
> * * *
>
> (c) If a proceeding listed in paragraph (a) of this section concerns a child who meets the statutory definition of "Indian child," then ICWA will apply to that proceeding. In determining whether ICWA applies to a proceeding, the State court may not consider factors such as the participation of the parents or the Indian child in Tribal cultural, social, religious, or political activities, the relationship between the Indian child and his or her parents, whether the parent ever had custody of the child, or the Indian child's blood quantum.

*See also* Ohio Adm.Code 5101:2-53-02.

{¶ 54} When there are sufficient indications that a child involved in child custody proceedings may be an Indian child, ICWA requires the relevant tribe(s) receive notice of the pending proceedings and of the tribe's right of intervention.  25 U.S.C. 1912(a),[8] which governs notice requirements under ICWA, provides:

> In any involuntary proceeding in a State court, where the court *knows or has reason to know* that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention.

(Emphasis added.)

{¶ 55} 25 C.F.R. 23.107 explains the obligation of a state court to inquire of each participant in a child custody proceeding whether the participant knows or has reason to know the child is an Indian child.  25 C.F.R. 23.107provides as follows:

> (a) State courts must ask *each participant* in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child. The inquiry is made at the commencement of the proceeding and all responses should be on the record. State *courts must instruct the parties to inform the court if they*

---

[8] *See* 25 U.S.C. 1911 (governing jurisdiction in Indian child custody proceedings). *See also In re C.J.*, 10th Dist. No. 16AP-891, 2018-Ohio-931 (providing extensive analysis of 25 U.S.C. 1911 in a permanent custody case).

> *subsequently receive information that provides reason to know the child is an Indian child.*

(Emphasis added.)

{¶ 56} The juvenile court here did not make the ICWA inquiry as outlined above in 25 C.F.R. 23.107(a). Shortly after the complaint was filed and the magistrate issued orders for temporary custody, on June 15, 2018, the magistrate held a hearing. At the hearing, appellant was unrepresented but informed the court she wished to be appointed counsel. After noting appellant's request for appointed counsel, the magistrate acknowledged she would have to continue the hearing. Notwithstanding this acknowledgement, the magistrate proceeded and inquired of appellant, as follows:

> [Magistrate]: [D]o you have any Native American heritage in your background?
> [Appellant]: Cherokee.
>
> [Magistrate]: All right, are you a member?
>
> [Appellant]: No.

(June 15, 2018 Tr. at 4.)

{¶ 57} On June 20, 2018, the magistrate filed an entry reflecting appellant was sworn in for "Native American heritage history." Also present at the June 15, 2018 hearing were: (1) counsel for FCCS, (2) liaison for FCCS, and (3) the GAL for the children, yet the magistrate made no ICWA inquiry of these three participants. Nor did the magistrate instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.

{¶ 58} A little more than a year later, on July 18, 2019, the juvenile court held a pretrial hearing on the motions for permanent custody. At the hearing, counsel for FCCS stated: "As to ICWA, it's my understanding that there are no allegations -- no current allegations of any specific tribal affiliations as required by any parent involved in this case." (July 18, 2019 Tr. at 4.) Also present at the hearing were: (1) appellant, (2) appellant's counsel (Miller), (3) counsel for the children (Murphy), and (4) the GAL for the children. The court did not make an ICWA inquiry of these four participants. The court also did not instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.

{¶ 59} Finally, at the permanent custody hearing on December 2, 2019, the juvenile court engaged in dialogue with the parties regarding ICWA compliance as follows:

[Judge]: The question was posted as to whether or not the requirements of ICWA had been met and hopefully, someone has that answer for us.

* * *

[FCCS Attorney]: We did locate a log in which intake has asked [appellant] if she participated with any Cherokee tribal affiliation or membership. The answer was in the negative. And then on June 15, 2018, subsequent to the complaint being filed where [appellant] alleged some kind of Cher -- Cherokee - * * * heritage, [appellant] was put under oath on the record as noted under [the juvenile court magistrate's] order and she did state that she did -- was not eligible for membership and therefore, no ICWA notifications would be required under the law. And at that point the prosecutor had proceeded on the adjudication/disposition as those notifications weren't required. But we did locate that; that is all in the record. [Appellant] was put under oath again on June 15, 2018 and all of that testimony is on the Court's record. Thank you.

[Judge]: Thank you. Not being familiar with the whole ICWA process, I trust that satisfies everyone's concerns in regard to ICWA?

[Appellant's counsel]: Yes, Your Honor.

[Judge]: Very good then.

(Dec. 2, 2019 Tr. at 7-8.) Contrary to the assertion of FCCS's counsel, appellant did not state at the June 15, 2018 hearing that "[she] was not eligible for membership." (Dec. 2, 2019 Tr. at 7-8.) Rather, appellant responded only "[n]o" when asked whether she was a member of the tribe after identifying her heritage as Cherokee. (June 15, 2018 Tr. at 4.) Furthermore, the juvenile court did not inquire of counsel for the children or the GAL at this hearing.

{¶ 60} Appellant alleges the juvenile court erred in concluding ICWA did not apply. Yet, it is not possible to determine whether ICWA applies or does not apply if the proper inquiry pursuant to 25 C.F.R. 23.107 is not made. Furthermore, FCCS mischaracterized appellant's testimony regarding her heritage to the juvenile court.

{¶ 61} The importance of a proper ICWA inquiry cannot be overstated. Ohio Adm.Code 5101:2-53-02(A) requires public children services agencies such as FCCS to

comply with ICWA.[9]  It states that "[f]ailure to identify Indian children can nullify court proceedings that have not been conducted in accordance with ICWA."  Ohio Adm.Code 5101:2-53-02(A).  Furthermore, 25 U.S.C. 1914 provides a collateral remedy for an Indian child's tribe to bring an action to invalidate a custody determination upon a demonstration that there was a violation of ICWA, including the notice provisions in 25 U.S.C. 1912.  *See A.G.* at ¶ 20 (stating that "the remedy that Congress has provided for a failure to comply with ICWA's provisions, including its notice provisions, is to allow an Indian child, parent, or tribe to petition to invalidate the termination judgment"). (Citations and internal quotations omitted.)  The collateral consequences of not making a proper inquiry are potentially severe and could cause significant disruption for children and families affected by the same beyond termination of a permanent custody case.[10]

{¶ 62} The purpose of the court's inquiry is to determine whether it "knows or has reason to know" if a child is an Indian child under ICWA.  If the court knows or has reason to know that an Indian child is involved, the party seeking termination of parental rights, here, FCCS, "shall notify the parent or Indian custodian and the Indian child's tribe * * * of the pending proceedings and of their right of intervention." 25 U.S.C. 1912(a).[11]

---

[9] Ohio Adm.Code 5101:2-53-01 through 5101:2-53-04 outline the specific obligations of public children services agencies, such as FCCS, and private child placing agencies to comply with ICWA. Upon making proper inquiry, pursuant to 25 C.F.R. 23.107, as an extra measure to ensure compliance, the juvenile court may consider inquiring if the public children services agency complied with Ohio Adm.Code 5101:2-53-01 through 5101:2-53-04. The rules state in part that "upon the initial face to face contact with the child or the child's parent, guardian or custodian," the agency "shall ask case participants whether the participant knows or has reason to know * * * that the child is an Indian child." Ohio Adm.Code 5101:2-53-03(A).

[10] The Supreme Court of Michigan noted that "[p]ursuant to [25 U.S.C. 1914] and *with no apparent time limitation on when the collateral action may be brought*—the Indian child, a parent, an Indian custodian of the child, or the child's tribe may petition a court to invalidate foster care placements and terminations of parental rights if the state court violated *any* provision included in 25 U.S.C. 1911, 1912, or 1913." (Emphasis added and sic.)  *In re Morris*, 491 Mich. 81, 101 (2012).

[11] Regarding the obligations of public children services agencies, prior to initiating relevant court action, the agency must comply with a similar requirement. Ohio Adm.Code 5101:2-53-03 provides:

(E) If the agency is initiating court action for removal or custody of the child and information is obtained that suggests a child is an Indian child and a tribe or possible tribes have been identified, the agency shall do all of the following:

(1) Contact the tribe or possible tribes within fourteen calendar days of the date the information was obtained; and

{¶ **63**} 25 C.F.R. 23.107(c),[12] states in relevant part that:

> A court, upon conducting the inquiry required in paragraph (a) of this section, has reason to know that a child involved in an emergency or child-custody proceeding is an Indian child if:
>
> (1) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that the child is an Indian child;
>
> (2) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child;

---

(2) Submit a request to each possible tribe for written verification from the tribe regarding the child's tribal membership or eligibility for tribal membership. The agency's inquiry to the tribe shall be sent by registered or certified mail with "return receipt requested". A list of federally recognized tribes which includes a contact person and address for each tribe is available on the BIA website at www.bia.gov. If the tribe does not respond to written inquiries, the caseworker shall seek assistance in contacting the Indian tribe from the BIA regional office in Minnesota or the BIA's central office in Washington D.C. * * *

Relatedly, Ohio Adm.Code 5101:2-53-04 provides:

(A) When a public children services agency (PCSA) or private child plating agency (PCPA) knows or has reason to know that an Indian child is the subject of an involuntary foster care placement or termination of parental rights proceeding, the agency shall send notice of each proceeding to:

(1) Each tribe where the child is or may be a member, or eligible for membership if a biological parent is a member;

(2) The child's parents; and

(3) The child's Indian custodian, if applicable.

(B) If the identity or location of the child's parents, the child's Indian custodian, or the tribes in which the Indian child is a member or eligible for membership cannot be determined, but there is reason to know the child is an Indian child, the agency shall send the notice to the regional office of the bureau of Indian affairs (BIA) that is identified in paragraph (E) of this rule.

[12] Regarding the obligations of public children services agencies, Ohio Adm.Code 5101:2-53-02 provides:

(F) An agency has reason to know that a child is an Indian child if:

(1) Any individual or agency relevant to the case informs the agency that the child is an Indian child or *has discovered information indicating that the child is an Indian child*;

(2) The child gives the agency reason to know he or she is an Indian child;

(3) The agency is informed that the domicile or residence of the child, the child's parent, or the child's Indian custodian is on a reservation or in an Alaska native village;

(4) The agency is informed that the child is or has been a ward of a tribal court; or

(5) The agency is informed that either parent or the child possesses an identification card indicating membership in an Indian tribe.

(Emphasis added.)

(3) The child who is the subject of the proceeding gives the court reason to know he or she is an Indian child;

(4) The court is informed that the domicile or residence of the child, the child's parent, or the child's Indian custodian is on a reservation or in an Alaska Native village;

(5) The court is informed that the child is or has been a ward of a Tribal court; or

(6) The court is informed that either parent or the child possesses an identification card indicating membership in an Indian Tribe.

{¶ 64} There may be times when the threshold of "reason to know" is met, yet the court does not have sufficient evidence to determine whether the child is or is not an Indian child. In such instance, the court must:

(1) Confirm, by way of a report, declaration, or testimony included in the record that the agency or other party used due diligence to identify and work with all of the Tribes of which there is reason to know the child may be a member (or eligible for membership), to verify whether the child is in fact a member (or a biological parent is a member and the child is eligible for membership); and

(2) Treat the child as an Indian child, unless and until it is determined on the record that the child does not meet the definition of an "Indian child" in this part.

25 C.F.R. 23.107(b).[13]

{¶ 65} Effective December 12, 2016, the Bureau of Indian Affairs issued updated guidelines to provide guidance to state courts and child welfare agencies in implementing the provisions of ICWA. *See A.G.* at ¶ 18. The guidelines provide the following relevant commentary:

[T]he trigger for treating the child as an "Indian child" is the reason to know that the child is an Indian child. This is not based on the race of the child, but rather indications that the child and her parent(s) may have a political affiliation with a

---

[13]Regarding the obligations of public children services agencies, Ohio Adm.Code 5101:2-53-03, provides as follows:

(C) If there is reason to know that the child is an Indian child, but the agency does not have sufficient evidence to determine that the child is or is not an Indian child, the agency shall:

(1) Use due diligence to identify and work with all of the tribes of which there is reason to know that the child may be a member or eligible for membership and to verify that the child is a member or a biological parent is a member and the child is eligible for membership; and

(2) Treat the child as an Indian child, unless and until it is determined that the child does not meet the definition of an Indian child.

Tribe. * * * [T]his requirement ensures that ICWA's requirements are followed from the early stages of a case and that harmful delays and duplication resulting from the potential late application of ICWA are avoided. If, based on feedback from the relevant Tribe(s) or other information, it turns out that the child is not an "Indian child," then the State may proceed under its usual standards.

81 Fed.Reg. 38778, 38806.

{¶ 66} Furthermore, 25 C.F.R. 23.108(a), which details the responsibility for determining whether a child is a member of a tribe, provides:

The Indian Tribe of which it is believed the child is a member (or eligible for membership and of which the biological parent is a member) determines whether the child is a member of the Tribe, or whether the child is eligible for membership in the Tribe and a biological parent of the child is a member of the Tribe, except as otherwise provided by Federal or Tribal law.

(b) The determination by a Tribe of whether a child is a member, whether a child is eligible for membership, or whether a biological parent is a member, is solely within the jurisdiction and authority of the Tribe, except as otherwise provided by Federal or Tribal law. The State court may not substitute its own determination regarding a child's membership in a Tribe, a child's eligibility for membership in a Tribe, or a parent's membership in a Tribe.

(c) The State court may rely on facts or documentation indicating a Tribal determination of membership or eligibility for membership in making a judicial determination as to whether the child is an "Indian child." An example of documentation indicating membership is a document issued by the Tribe, such as Tribal enrollment documentation.

{¶ 67} Without proper inquiry, pursuant to 25 C.F.R. 23.107, the juvenile court cannot determine if it knows or has reason to know if the children are Indian children as defined in 25 U.S.C. 1903. Without making such "knows or has reason to know" determination, the juvenile court cannot determine if the notice of right of intervention to relevant tribe(s) applies. 25 U.S.C. 1912(a).

{¶ 68} As such proper inquiry was not made here, we expressly make no determination as to whether the juvenile court knows or has reason to know pursuant to 25 C.F.R. 23.107(c). We also expressly make no determination as to whether the children are Indian children as defined in 25 U.S.C. 1903. Nevertheless, given the potential for invalidation of a custody determination, we sustain the third assignment of error and

remand these cases to the juvenile court with instructions to conduct proper inquiry pursuant to 25 C.F.R. 23.107. The inquiry shall be conducted promptly upon remand.

**VI. Second Assignment of Error—GAL**

{¶ 69} In her second assignment of error, appellant asserts the juvenile court committed plain error by admitting the testimony of the GAL given the GAL's deficient investigation.

{¶ 70} R.C. 2151.281, which governs the appointment of a GAL, requires a juvenile court to "appoint a guardian ad litem, subject to rules adopted by the supreme court, to protect the interest of a child * * * in any [permanent custody] proceeding held pursuant to [R.C.] 2151.414." R.C. 2151.281(B)(1). The Ohio Rules of Juvenile Procedure in effect during 2018 and 2019 provide that a juvenile court "shall appoint a guardian ad litem to protect the interests of a child * * * involv[ing] allegations of abuse or neglect, voluntary surrender of permanent custody, or termination of parental rights as soon as possible after the commencement of such proceeding." Juv.R. 4(B).[14] R.C. 2151.281(D) provides that the juvenile court "shall require the guardian ad litem to faithfully discharge the guardian ad litem's duties and, upon the guardian ad litem's failure to faithfully discharge the guardian ad litem's duties, shall discharge the guardian ad litem and appoint another guardian ad litem."

{¶ 71} R.C. 2151.281(I) provides:

> The guardian ad litem for an alleged or adjudicated abused, neglected, or dependent child shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child in accordance with rules adopted by the supreme court.

{¶ 72} Article IV, Section 5(A)(1) of the Ohio Constitution provides the Supreme Court with general superintendence over all the courts in the state. In accordance with this power, the Supreme Court originated the Rules of Superintendence for the Courts of Ohio, including the courts of common pleas and the divisions thereof. Sup.R. 1. *See Arlington Bank v. Bee, Inc.*, 10th Dist. No. 10AP-41, 2010-Ohio-6040, ¶ 16.

---

[14] We note Juv.R. 4 has recently been amended effective July 1, 2020. Unless otherwise noted, all references are to the version in effect at the time of the proceedings in the juvenile court.

{¶ 73} Regarding the duties of a GAL, the Rules of Superintendence in effect, in 2018 and 2019 when the GAL in these cases conducted his investigation and prepared his report, provided in relevant part:

> In order to provide the court with relevant information and an informed recommendation regarding the child's best interest, a guardian ad litem shall perform, at a minimum, the responsibilities stated in this division, unless impracticable or inadvisable to do so.
>
> * * *
>
> (13) A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties. In order to provide the court with relevant information and an informed recommendation as to the child's best interest, a guardian ad litem shall, at a minimum, do the following, unless impracticable or inadvisable because of the age of the child or the specific circumstances of a particular case:
>
> (a) Meet with and interview the child and observe the child with each parent, foster parent, guardian or physical custodian and conduct at least one interview with the child where none of these individuals is present;
>
> (b) Visit the child at his or her residence in accordance with any standards established by the court in which the guardian ad litem is appointed;
>
> (c) Ascertain the wishes of the child;
>
> (d) Meet with and interview the parties, foster parents and other significant individuals who may have relevant knowledge regarding the issues of the case;
>
> (e) Review pleadings and other relevant court documents in the case in which the guardian ad litem is appointed;
>
> (f) Review criminal, civil, educational and administrative records pertaining to the child and, if appropriate, to the child's family or to other parties in the case;
>
> (g) Interview school personnel, medical and mental health providers, child protective services workers and relevant court personnel and obtain copies of relevant records;

> (h) Recommend that the court order psychological evaluations, mental health and/or substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court; and
>
> (i) Perform any other investigation necessary to make an informed recommendation regarding the best interest of the child.

2019 Sup.R. 48(D)(13).[15]

{¶ 74} In 2018 and 2019, when the GAL prepared his report and the court reviewed the report, the Rules of Superintendence regarding GAL reports provided in relevant part:

> A guardian ad litem shall prepare a written final report, including recommendations to the court, within the times set forth in this division. The report shall detail the activities

---

[15] Recently, the Supreme Court amended the rules regarding the duties of a GAL, and these amendments went into effect January 1, 2021. Significant changes were made, including the deletion of the GAL's discretion to not perform duties "unless impracticable or inadvisable" and to "make reasonable efforts" to perform the duties. Now, the rules provide the GAL shall perform the duties "[u]nless specifically relieved by the court," thereby giving the discretion to the court, not the GAL, to determine when it is impracticable or inadvisable to not perform duties and whether the GAL has engaged in reasonable efforts to perform the duties. The current rules also impose different and additional requirements than were imposed in 2019. 2021 Sup.R. 48.03(D) requires:

Unless specifically relieved by the court, the duties of a guardian ad litem shall include, but are not limited to, the following:

(1) Become informed about the facts of the case and contact all relevant persons;

(2) Observe the child with each parent, foster parent, guardian or physical custodian;

(3) Interview the child, if age and developmentally appropriate, where no parent, foster parent, guardian, or physical custodian is present;

(4) Visit the child at the residence or proposed residence of the child in accordance with any standards established by the court;

(5) Ascertain the wishes and concerns of the child;

(6) Interview the parties, foster parents, guardians, physical custodian, and other significant individuals who may have relevant knowledge regarding the issues of the case. The guardian ad litem may require each individual to be interviewed without the presence of others. Upon request of the individual, the attorney for the individual may be present[;]

(7) Interview relevant school personnel, medical and mental health providers, child protective services workers, and court personnel and obtain copies of relevant records;

(8) Review pleadings and other relevant court documents in the case;

(9) Obtain and review relevant criminal, civil, educational, mental health, medical, and administrative records pertaining to the child and, if appropriate, the family of the child or other parties in the case;

(10) Request that the court order psychological evaluations, mental health or substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court;

(11) Review any necessary information and interview other persons as necessary to make an informed recommendation regarding the best interest of the child.

performed, hearings attended, persons interviewed, documents reviewed, experts consulted and all other relevant information considered by the guardian ad litem in reaching the guardian ad litem's recommendations and in accomplishing the duties required by statute, by court rule, and in the court's Order of Appointment. In addition, the following provisions shall apply to guardian ad litem reports in the juvenile and domestic relations divisions of Courts of Common Pleas:

(1) In * * * actions to terminate parental rights:

(a) All reports, written or oral, shall be used by the court to ensure that the guardian ad litem has performed those responsibilities required by section 2151.281 of the Revised Code.

(b) Oral and written reports may address the substantive allegations before the court, but shall not be considered as conclusive on the issues.

* * *

(d) A guardian ad litem shall be available to testify at the dispositional hearing and may orally supplement the final report at the conclusion of the hearing.

(e) A guardian ad litem also may file an interim report, written or oral, any time prior to the dispositional hearing and prior to hearing on actions to terminate parental rights.

2019 Sup.R. 48(F). [16]

{¶ 75} In addition to the statutory and Supreme Court rules that address GAL duties and reports, local court rules also address such duties and reports. Loc.R. 4 of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, ("Loc.Juv.R."), in effect in 2018 and 2019,[17] states in relevant part:

> (D) Duties and responsibilities of appointed counsel and guardians ad litem.
>
> Attorneys accepting appointments to serve as guardian ad litem, * * * shall initiate and maintain reasonable contact with their client, *which should be no less than once per month.* The attorney/guardian ad litem shall advise his / her client / ward of the client's / ward's rights and the possible consequences of the pending action.
>
> * * *
>
> (1) Upon appointment the * * * guardian ad litem, * * * shall make reasonable efforts to become informed about the facts of the case and to contact all relevant persons. The * * * guardian ad litem, * * * shall, at a minimum, perform certain basic duties,

---

[16] The Supreme Court also amended the rules regarding GAL reports, and the amendments went into effect January 1, 2021. Perhaps most significantly, the GAL is now required to include in the report an affirmative statement that all responsibilities have been met. Now, 2021 Sup.R. 48.06(A) governs GAL reports, and provides in relevant part:

**(A) General report requirements**

(1) A guardian ad litem shall prepare a written final report, including recommendations to the court, within the times set forth in this division. The report shall affirmatively state that responsibilities have been met and shall detail the activities performed, hearings attended, persons interviewed, documents reviewed, experts consulted, and all other relevant information considered by the guardian ad litem in reaching the recommendations and in accomplishing the duties required by statute, by court rule, and in the order of appointment from the court.

* * *

(3) Oral and written reports shall address relevant issues, but shall not be considered determinative.

(4) A guardian ad litem shall be available to testify at any relevant hearing and may orally supplement the report at the conclusion of the hearing.

Furthermore, 2021 Sup.R. 48.07 governs the responsibilities of courts appointing GALs, stating that such courts "shall," among other listed duties, "[r]eview all guardian ad litem reports, written or oral, to ensure that the guardian ad litem has performed those responsibilities required by R.C. 2151.281." 2021 Sup.R. 48.07(G).

[17] The Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, currently has posted on its website a notice that it is soliciting comments regarding proposed additions and amendments to Local Juvenile Rule 4 through January 14, 2021. The website also notes the additions and amendments have been approved for immediate adoption pursuant to Supreme Court Rule of Superintendence 5.

as warranted by the facts of the case, unless impracticable or inadvisable because of the age of the child or the specific circumstances of a particular case.

(a) When the child is of sufficient age to have communicative ability, meet with and interview the child(ren) and ascertain the child's wishes. Observe the child with each parent, foster parent, guardian or physical custodian and conduct at least one interview with the child where none of these individuals is present. *Be aware of the interaction between the parent and child, and the appropriateness of discipline, conversations, and activities.* Interview both parents if permitted by their counsel. If only one parent is known, attempt to ascertain the identity and whereabouts of the other parent.

(b) Review pleadings and other relevant court documents, and consult with each attorney as to position and issues. File pleadings, motions and other documents as appropriate under the applicable rules of procedure. Review the court file, and request discovery.

(c) Meet with and interview all significant individuals who may have relevant knowledge regarding the issues of the case.

(d) Determine the physical and mental health of the child. Interview medical and mental health providers, and obtain copies of relevant records, including medical and hospital records.

(e) Interview school personnel. Obtain information regarding the child's behavior in school and interaction with parents. Review and obtain copies of the child's school records.

(f) Perform home visits (this may be combined with the interview process). Observe the living conditions of each parent and the child's sleeping arrangements.

(g) Evaluate the necessity, if any, of psychological evaluations or counseling, mental health and / or substance abuse assessments, or other evaluations or tests of the parties and file a motion requesting the same.

* * *

(i) Communicate with the Franklin County Children Services worker, and other direct service providers. Obtain the case history. Confirm whether the child has been removed from home and the child's adjustment to his/her current placement. Confirm the names, addresses, and telephone numbers of

parents and care providers. Determine what services are being provided the parents.

* * *

(k) Ask the care providers for their perceptions of the child's adjustment. Assess the child's developmental level. If the child relates a new allegation of abuse or neglect, immediately call FCCS intake, the caseworker, and the Family Assessment caseworker.

(l) Review criminal, civil, educational and administrative records pertaining to the child and, if appropriate, to the child's family or to other parties in the case.

(m) Be cognizant that the duty of an attorney to his/her client and the duty of a guardian ad litem to his/her ward are not always identical and, in fact, may conflict. The role of the guardian ad litem is to investigate the ward's situation and then to ask the court to do what the guardian ad litem feels is in the ward's best interest. The role of the attorney is to zealously represent his/her client within the bounds of the law. The first and highest duty of an attorney appointed in a dual capacity is to zealously represent his client within the bounds of the law and to champion his client's cause.

* * *

(o) Perform any other investigation necessary and appear and participate in any hearing for which the duties of the attorney or guardian ad litem or any issues substantially within an attorney's or guardian ad litem's duties and scope of appointment are to be addressed.

* * *

(q) Perform all duties and responsibilities in a prompt and timely manner, and, if necessary, request timely court reviews and judicial intervention in writing with notice to parties or affected agencies.

* * *

(s) Maintain a log documenting all work performed, all contact with the child, parties, witnesses, etc., and all telephone calls. Keep accurate records of the time spent, services rendered, and expenses incurred in each case and file an itemized statement and accounting with the court.

* * *

(3) Reports and court appearances.

A guardian ad litem shall be present at all hearings pertaining to the child(ren), and shall prepare a written final report, including recommendations to the court, within the times set forth in this division. The report shall detail the activities performed, hearings attended, persons interviewed, documents reviewed, experts consulted and all other relevant information considered by the guardian ad litem in reaching the guardian ad litem's recommendations and in accomplishing the duties required by statute, by court rule, and in the court's Order of Appointment. In addition, the following provisions shall apply to guardian ad litem reports:

In juvenile abuse, neglect, and dependency cases and actions to terminate parental rights:

(a) All reports, written or oral, shall be used by the court to ensure that the guardian ad litem has performed those responsibilities required by Ohio Revised Code 2151.281.

(b) Oral and written reports may address the substantive allegations before the court, but shall not be considered as conclusive on the issues.

* * *

(d) A guardian ad litem shall be available to testify at the dispositional hearing and may orally supplement the final report at the conclusion of the hearing.

(e) A guardian ad litem also may file an interim report, written or oral, any time prior to the dispositional hearing and prior to hearings on actions to terminate parental rights. Written reports may be accessed in person or by phone by the parties or their legal representatives.

(Emphasis added.)

{¶ 76} Appellant failed to object to the admission of the GAL's testimony before the juvenile court and, therefore, has forfeited all but plain error. *L.W.* at ¶ 36; *In re W.*, 4th Dist. No. 05CA4, 2005-Ohio-2977, ¶ 25. "In civil cases, the plain error doctrine is not favored and may only be applied in the extremely rare case involving exceptional circumstances such that the error, if left uncorrected, would challenge the fairness,

integrity, or public reputation of the judicial process itself." *Brisco v. U.S. Restoration & Remodeling, Inc.*, 10th Dist. No. 18AP-109, 2019-Ohio-5318, ¶ 25. *See State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, ¶ 40, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997) (stating that "[a]s when they apply criminal plain-error review, reviewing courts applying civil plain-error review 'must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice' "); *L.W.* at ¶ 36. " 'Because parental rights determinations are difficult to make and appellate courts accord wide latitude to the trial court's consideration of evidence in these cases, "[p]lain error is particularly difficult to establish." ' " *Hamilton v. Hamilton*, 10th Dist. No. 14AP-1061, 2016-Ohio-5900, ¶ 8, quoting *Faulks v. Flynn*, 4th Dist. No. 13CA3568, 2014-Ohio-1610, ¶ 20, quoting *Robinette v. Bryant*, 4th Dist. No. 12CA20, 2013-Ohio-2889, ¶ 28.

{¶ 77} Furthermore, we are mindful that courts have held the Rules of Superintendence do not create individual rights. In *Lucas v. Byers*, 11th Dist. No. 2020-L-010, 2021-Ohio-246, ¶ 71, the Eleventh District Court of Appeals stated:

> Preliminarily, this court has held that the Rules of Superintendence, " 'are not the equivalent of rules of procedure and have no force equivalent to a statute. They are purely internal housekeeping rules which are of concern to the judges of the several courts but create no rights in individual defendants.' " *Habo v. Khattab*, 11th Dist. No. 2012-P-0117, 2013-Ohio-5809, ¶ 84, quoting *State v. Gettys*, 49 Ohio App.2d 241, 243 (3d Dist.1976). Further, in *Miller v. Miller*, 4th Dist. No. 14CA6, 2014-Ohio-5127, the court observed: "we have generally refused to conclude that a guardian *ad litem's* failure to comply with Sup.R. 48(D) constitutes grounds for reversal." (Emphasis sic.) *Miller, supra*, at ¶ 17.

*See also In re K.W.*, 4th Dist. No. 17CA-7, 2018-Ohio-1933, ¶ 99; *In re L.S.*, 8th Dist. No. 108666, 2019-Ohio-5347; *In re S.S.*, 10th Dist. No. 17AP-681, 2018-Ohio-1249, ¶ 11 ("Rules of Superintendence are only internal housekeeping rules that do not create substantive rights in individuals or procedural law, and they do not have the force of law.").

{¶ 78} Nevertheless, it bears mentioning here, the juvenile court observed, questioned, and noted numerous deficiencies in the performance of duties by the GAL. The juvenile court found the GAL "*only* first met the children prior to writing his July 2019 Report." (Emphasis added.) (Decision at 9.) The juvenile court noted that since the time

the GAL met with R.P. and C.P. in the foster home in Galion, R.P. had been placed at St. Vincent's and would be unable to return to the foster home.

{¶ 79} Importantly, the juvenile court acknowledged that "[b]ased upon the cross examination of the Guardian[,] the Court understands that there were opportunities for the Guardian to observe [appellant] visiting with the children that were missed by the Guardian." (Decision at 9.) Furthermore, the juvenile court found that "[t]he Guardian was also unaware that all four children had a visit together without their [appellant] present." (Decision at 9.) The court found the GAL was "not able to say that all four of the children are bonded." (Decision at 10.)

{¶ 80} We share the juvenile court's concerns and observe additional deficiencies in the performance of duties and report of the GAL. The juvenile court's focus in determining whether to terminate parental rights is the best interest of the child. R.C. 2151.414(B)(1) and (D)(1)(a) through (e). The duties established by the Rules of Superintendence are imposed "[i]n order to provide the court with relevant information and an informed recommendation as to the child's best interest." 2019 Sup.R. 48(D)(13). The GAL here did little to assist the court in this regard.

{¶ 81} As noted above, the Rules of Superintendence make clear that it is incumbent upon the GAL to "[b]ecome informed about the facts of the case." 2019 Sup.R. 48(D)(13). *See also* Loc.Juv.R. 4(D)(1). The GAL in these cases was not informed about many important facts of these cases, including he was not able to state how long the children had been in FCCS's custody other than to state it had been for more than 12 out of the last 22 months.

{¶ 82} Many of the Rules of Superintendence impose a requirement that the GAL meet with, interview, or observe the children. 2019 Sup.R. 48(D)(13)(a), (b), and (c) require the GAL: (1) meet with and interview the children, (2) observe the children with the parent, foster parent, guardian or physical custodian, (3) conduct one interview with the children where none of these individuals is present, (4) visit the children at his or her residence in accordance with any standards established by the court in which the GAL is appointed, and (5) ascertain the wishes of the children. The juvenile court imposed similar standards pursuant to Loc.Juv.R. 4(D)(1)(a) and (f) duties and further required the GAL "[o]bserve the child [and] [b]e aware of the interaction between the parent and child, and the appropriateness of discipline, conversations, and activities," and "shall initiate and

maintain reasonable contact with their client, which should be no less than once per month."

{¶ 83} Here, the record reveals the GAL failed to fulfill many of the aforementioned duties of meeting with, interviewing, observing, and ascertaining the wishes of the children. First, it appears the GAL met with and interviewed the children only once during the course of his appointment, which began June 9, 2017 in the prior cases and June 21, 2018 in the present cases. This conclusion is based on the testimony of the GAL and the juvenile court's observation that the GAL "*only* first met the children prior to writing his July 2019 Report." (Emphasis added.) (Decision at 9.) This is well short of the "once per month" standard set forth in the local rules and frankly well short of any standard considering the GAL had served for approximately two years prior to writing the report and two and one-half years prior to testifying at the hearing.

{¶ 84} Second, the record supports the juvenile court's conclusion that the GAL missed opportunities to observe the children, both on their own, and with appellant present. On cross-examination, the GAL testified:

> [Attorney for the Children]:
>
> Q. Did you ever make attempts to go to the visitation between [appellant] and the children?
>
> A. I did not, no. I was never - - I would have loved to, but I never knew when she was or wasn't gonna [sic] show up, that was a problem; I would say the reason why I never did that.
>
> Q. Were you ever made aware that she was visiting the children?
>
> A. I heard that they were sporadic and that they would happen sometimes and not happen other times.
>
> Q. Were you aware that the Agency would have all four children come visit together and let them visit even when [appellant] wasn't present?
>
> A. No.

(Dec. 2, 2019 Tr. at 59-60.) The testimony of Marshall reveals appellant's attendance was indeed sporadic; nevertheless, there was no evidence the GAL made any inquiries regarding the date and time of scheduled visits or any attempt at all to observe scheduled visits.

{¶ 85} Third, the GAL visited R.P. while R.P. was in the foster home with C.P. However, in July 2019, R.P. was placed at St. Vincent's and the GAL never visited R.P. from the time of placement at St. Vincent's through the time of the permanent custody hearing in December 2019, at which point R.P. was ready to be discharged from St. Vincent's. Fourth, there is no indication the GAL visited the children when they were placed with appellant's sister in November and December 2018. Fifth, it is unclear from the record whether, or to what extent, the GAL interviewed the children where no foster parent, guardian, or physical custodian was present. In particular, the GAL met with D.E., Jr. in the presence of D.E., Jr.'s clinician. The GAL testified that D.E., Jr. asked for the clinician to be present because D.E., Jr. "wanted somebody there that he knew." (Dec. 2, 2019 Tr. at 53.) It is not clear whether the GAL returned to attempt to meet with D.E., Jr. outside of the presence of the clinician.

{¶ 86} Finally, during the course of interviews and meetings with the children the GAL was required to ascertain the wishes and concerns of the children. Yet, the GAL visited each of the children only once, and he was unable to ascertain T.P.'s wishes because, according to the GAL, T.P. "wouldn't give me any response other than she liked living where she was." T.P.'s foster parent informed the GAL that T.P. was "usually pretty talkative." (Dec. 2, 2019 Tr. at 50.) However, the GAL did not attempt to make another visit to speak with T.P.

{¶ 87} The Rules of Superintendence in effect in 2018 and 2019 also impose a requirement that the GAL "contact all parties," including "parties, foster parents and other significant individuals who may have relevant knowledge regarding the issues of the case [and] school personnel, medical and mental health providers." 2019 Sup.R. 48(D)(13)(d) and (g). The juvenile court imposed similar standards requiring the GAL "to contact all relevant persons" in conjunction with Loc.Juv.R. 4(D)(1)(c), (d), and (e) duties and further required the GAL "[a]sk the care providers for their perceptions of the child[ren]'s adjustment." Loc.Juv.R. 4(D)(1)(k). Loc.Juv.R. 4(D)(1)(d) further required that the GAL "[d]etermine the physical and mental health of the child."

{¶ 88} Here, the record reveals the GAL failed to fulfill many of the aforementioned duties of contacting all relevant persons and other specifically identified persons. First, certainly appellant was a relevant person to these cases. However, at the permanent custody hearing in these cases, the GAL stated his belief that the burden was inverse to this. The GAL testified that "my practice is that it's up to the parents to be the one to get in touch

with me so that I can see whether they're invested in the case or not." (Dec. 2, 2019 Tr. at 57.) It is unclear from the record what methods the GAL undertook, if any, to initially contact appellant. However, it is clear from the GAL's own testimony that he was aware appellant had attempted to reach him, but he missed the telephone call and, thereafter, made no attempt to engage with appellant.

{¶ 89} Second, although the report indicates the GAL spoke with D.E., Jr.'s clinician at Fox Run, it is not clear this contact was separate from the meeting the GAL had with D.E., Jr. when he was accompanied by the clinician. Furthermore, there is no indication either in the report or the GAL's testimony that he spoke with R.P.'s medical and mental health providers or caregivers at St. Vincent's. Nor is there any indication the GAL spoke with any of the children's school personnel. This lack of contact by the GAL is deeply concerning given the fact that D.E., Jr. was in residential care as a result of aggression, prescribed medication for ADHD and six medications for impulse control; R.P. was in residential care and prescribed medication for ADHD; T.P. was in counseling for behavioral issues; and all the children experience sleep issues. The juvenile court states in its decisions that the GAL reviewed the discovery, medical records and records pertaining to special needs, yet the GAL's report does not include medical, mental health or school records in the list of records he stated he reviewed, and contains no information or assessment regarding the same. The GAL testified:

> [Attorney for FCCS]: And do you [have] any understanding of the children's medical or any special needs?
>
> A. I haven't looked at it lately, to be honest with you, no, I mean, with -- with the parents not being involved and [appellant] never contacting me, you know, that wasn't a real concern for my -- about whether the [appellant] would be able to meet any needs of the children because the parents were just -- well, with the one parent being incarcerated and the other one at the time I had no idea where he was, that wasn't a major concern for me about whether they would or not be able to meet any medical needs or special needs because they were simply not involved.

(Dec. 2, 2019 Tr. at 53-54.)

{¶ 90} The GAL opined that it is in the best interest of the children to place the children into the permanent custody of FCCS, yet as summarized above, he failed to perform his required duties in significant ways. Furthermore, his report regarding appellant was primarily based on information he received from third parties. (*See* GAL

Report at 3.) It seems his testimony was also based, in part, on information he received from third parties. At the hearing, the GAL opined he had a concern with reunifying the children with appellant based on housing, and initially stated he based this opinion on "what I've heard from [the FCCS] caseworker [who] testified * * * today." (Dec. 2, 2019 Tr. at 57.) After prompting from the juvenile court judge, the GAL then stated his opinion was based on his independent review of the record. A GAL is under a duty to "provide the juvenile court with an independent evaluation of the issues." *In re Ridenour*, 11th Dist. No. 2003-L-146, 2004-Ohio-1958, ¶ 25. To this end, the "guardian's recommendation, then, should not be based on the testimony given at the hearing, but on the guardian's own experience in the case." *Id. See In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, ¶ 13 (stating that the purpose of the statutory provisions providing for the appointment of a GAL "is to give the court information, in addition to that elicited at the hearing, to assist it in making sound decisions concerning permanent custody placements").

{¶ 91} During the pendency of the permanent custody motions, the GAL sought and received multiple continuances, which he asserted were needed to complete his investigation. However, the GAL only met each of the children once, preventing him from giving any testimony on whether the children's wishes had changed or evolved over the duration of the matter. He did not follow up on his July 17, 2019 report with any additional visits with the children or attempts to observe the children with appellant despite the fact that on July 19, 2019, two days after the report was filed, the juvenile court continued the matter until December 2, 2019, over four months later.

{¶ 92} Notwithstanding the significant deficiencies in the investigation, we cannot find the juvenile court plainly erred in admitting the GAL's testimony and report. First, appellant did not argue any specific authority for exclusion of the GAL's testimony or report nor did she argue the juvenile court erred in its duty pursuant to R.C. 2151.281(D). Second, although in permanent custody proceedings, parents must be afforded every procedural and substantive protection the law allows, the duty of the GAL is to provide the court with information and recommendations regarding the children's best interest. The children in these cases were represented by counsel who was separate from the GAL. Counsel for the children did have an opportunity to cross-examine the GAL, and the children's counsel did not object to the GAL's testimony or report. Third, as noted above, the juvenile court acknowledged many of the deficiencies in its decision. Finally, it would be a rare circumstance for the court to find that the GAL's failure to comply with the Rules of

Superintendence or local rules alone would result in reversal. This is especially true when a juvenile court is not bound by a GAL's recommendations. *See In re Baby C.*, 10th Dist. No. 05AP-1254, 2006-Ohio-2067, ¶ 95; *Ramsey v. Ramsey*, 10th Dist. No. 13AP-840, 2014-Ohio-1921, ¶ 59 (stating that "[w]hile a court must consider the recommendation of a guardian ad litem, a court is not bound by such a recommendation"). Therefore, we cannot say the juvenile court plainly erred by admitting the testimony and report of the GAL. Accordingly, we overrule the second assignment of error.

## VII. Fourth Assignment of Error—Clear and Convincing Evidence

{¶ 93} In her fourth assignment of error, appellant asserts the juvenile court erred by granting FCCS's motion for permanent custody. Specifically, appellant asserts the juvenile court erred by: (1) finding appellant could not be reunited with the children within a reasonable period of time, (2) finding it was in the best interest of the children to grant permanent custody, (3) finding appellant abandoned the children, and (4) giving weight to the GAL's recommendation. Because we must reverse and remand this matter for the juvenile court to make a proper ICWA inquiry, it is premature to address appellant's arguments regarding the weight of the evidence. *See Columbus v. Phillips*, 10th Dist. No. 15AP-408, 2015-Ohio-5088, ¶ 46; *In re Kangas*, 11th Dist. No. 2006-A-0010, 2006-Ohio-3433, ¶ 56 (finding manifest weight argument in permanent custody case to be premature and moot in light of remand to afford parent opportunity to cross-examine GAL and present rebuttal evidence). As such, appellant's fourth assignment of error is rendered moot.

## VIII. Conclusion

{¶ 94} Having sustained appellant's third assignment of error, overruled appellant's first and second assignments of error, and found appellant's fourth assignment of error to be premature and moot, we reverse the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch and remand these matters for further proceedings consistent with this decision and law.

{¶ 95} We instruct the juvenile court to vacate its January 22, 2020 judgments granting permanent custody of the children to FCCS. Upon vacating the January 22, 2020 judgments, the January 4, 2019 motions for permanent custody filed pursuant to R.C. 2151.415 will still be pending as there will be no dispositional orders resolving the same. Therefore, we order the juvenile court to issue dispositional orders on the motions after making proper ICWA inquiry of each participant in the permanent custody proceeding

pursuant to 25 C.F.R. 23.107. The ICWA inquiry and dispositional orders shall be made and entered promptly upon remand of these cases.

{¶ 96} Upon vacating the January 22, 2020 judgments, pursuant to R.C. 2151.353(F),[18] the juvenile court shall retain jurisdiction over the children. Furthermore, on the facts of these cases,[19] as the motions for permanent custody pursuant to R.C. 2151.415

---

[18] R.C. 2151.353(F)(1) provides:

> The court shall retain jurisdiction over any child for whom the court issues an order of disposition pursuant to division (A) of this section or pursuant to section 2151.414 [permanent custody] or 2151.415 [(A)(4) permanent custody] of the Revised Code until the child attains the age of eighteen years * * *.

[19] The relevant facts here include that the juvenile court entered the original January 22, 2020 judgments prior to the expiration of the two-year sunset period for temporary custody set forth in R.C. 2151.353(G) and 2151.415(D)(4), appellant did not challenge the judgments on grounds of R.C. 2151.353(G) and 2151.415(D)(4), and the record before us reveals the problems that led to the original temporary custody order remain unresolved. We consider these facts mindful of the language of R.C. 2151.353(G) and 2151.415(D)(4) and the lack of precedent applying the same in the context of remand.

R.C. 2151.353(G) states:

> Any temporary custody order issued pursuant to division (A) of this section shall terminate one year after the earlier of the date on which the complaint in the case was filed or the child was first placed into shelter care, except that, upon the filing of a motion pursuant to section 2151.415 of the Revised Code, the temporary custody order shall continue and not terminate until the court issues a dispositional order under that section. In resolving the motion, the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of section 2151.415 of the Revised Code.

R.C. 2151.415(D)(4) states:

> No court shall grant an agency more than two extensions of temporary custody pursuant to division (D) of this section and the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of this section.

In 1996, the Supreme Court interpreted a former version of R.C. 2151.353(G) (then R.C. 2151.353(F)), and to this day many courts still look to *In re Young*, 76 Ohio St.3d 632 (1996), for guidance in interpreting the one-year sunset provision. *See In re A.J.*, 10th Dist. No. 13AP-864, 2014-Ohio-2734, ¶ 8-13. We acknowledge, however, that the statute was amended, effective in 2009, to add an additional two-year sunset provision. With 2007 Ohio H.B. No. 7, the 127th General Assembly added the language "[i]n resolving the motion, the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed * * *, regardless of whether any extensions have been previously ordered pursuant to division (D) of section 2151.415 of the Revised Code." R.C. 2151.353(G). Identical language was likewise added to R.C. 2151.415(D)(4).

have been filed and dispositional orders remain to be issued, pursuant to R.C. 2151.353(G), the juvenile court's temporary custody orders "shall continue and not terminate until the court issues * * * dispositional order[s] [pursuant to R.C. 2151.415]."

*Judgments reversed;
causes remanded with instructions.*

HESS, J., concurs.
LUPER SCHUSTER, J., concurs in part and dissents in part.

Hess, J., Assigned to active duty under authority of the Ohio
Constitution, Article IV, Section 6(C).

LUPER SCHUSTER, J., concurring in part and dissenting in part.

{¶ 97} I agree with the majority's decision to overrule appellant's first and second assignments of error. I disagree, however, with the majority's resolution of appellant's third and fourth assignments of error, and the reversal of the trial court's judgment. Unlike the majority, I would overrule all four of appellant's assignments of error and therefore affirm the trial court's judgment.

{¶ 98} The majority's decision to reverse the trial court's judgment is based on its resolution of appellant's third assignment of error. In this assignment of error, appellant alleges the trial court committed plain error by concluding the ICWA did not apply to the permanent custody proceedings. The majority concludes the trial court engaged in an

---

This court is not aware of any precedent instructing how to interpret and apply R.C. 2151.353(G) and 2151.415(D)(4) in circumstances where a case is remanded for a juvenile court to conduct additional inquiry before ruling on a pending permanent custody motion. In *State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Court of Common Pleas,* 150 Ohio St.3d 230, 2016-Ohio-7382, ¶ 23, the Supreme Court acknowledged the 2009 amendment stating, "[t]he fact that temporary custody cannot extend beyond two years, *see* R.C. 2151.415(D)(4), does not alter the nature of the continuing jurisdiction remaining with a juvenile court that issues a disposition of temporary custody." However, this statement was made in the context of a case where a probate court was exercising jurisdiction over a minor child for adoption proceedings and a juvenile court was concurrently exercising continuing jurisdiction over the child custody proceedings. In addition, there seems to be conflicting precedent from other appellate courts interpreting and applying R.C. 2151.353(G) in the context where a juvenile court ruled on pending permanent custody motions, in the first instance, beyond the two-year sunset. *See In re J.W.*, 11th Dist. No. 2017-G-0139, 2018-Ohio-2475, ¶ 34-47. *Compare In re M.O.*, 2d Dist. No. 25965, 2014-Ohio-3060, ¶ 11-15.

For these reasons, we confine our instruction regarding temporary custody on remand to the facts of these cases. Furthermore, sensitive to the concern that children and parents not be left in legal limbo for months and even years while waiting for courts to process their cases, we instruct the juvenile court, upon remand, to act promptly to make proper inquiry pursuant to ICWA and to enter dispositional orders on the pending permanent custody motions. *See In re K.M.*, 159 Ohio St.3d 544, 2020-Ohio-995, and *In re Davis*, 84 Ohio St.3d 520, 528 (1999).

inadequate inquiry regarding whether the children are Indian children, as defined in 25 U.S.C. 1903. Consequently, the majority sustains appellant's third assignment of error and remands this matter for a proper inquiry as to this issue. In my view, however, our analysis should be limited to the arguments appellant presents, which does not include an allegation that the trial court's ICWA inquiry was deficient.

{¶ 99} In support of her third assignment of error, appellant only argues that, contrary to the trial court's conclusion, the requirements of ICWA apply because her children are Indian children. For ICWA to apply to a child custody proceeding in state court, there must be a preliminary showing that the proceeding involves an "Indian child." *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, ¶ 4 (8th Dist.). Pursuant to 25 U.S.C. 1903, an "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." Appellant reasons that because she informed the trial court she is of Cherokee heritage, she is an automatic member of an Indian tribe, thereby qualifying her children as Indian children under this definition. But this reasoning is flawed. First, appellant specifically testified before the trial court that while she has Cherokee heritage, she is not a member of that tribe. Second, general evidence of a parent's Indian ancestry is not, in itself, sufficient to invoke ICWA. *See, e.g., In re C.C.* at ¶ 6 (evidence that the child's great-grandmother was a member of the Cherokee tribe was not sufficient to invoke ICWA); *see also Nielson v. Ketchum*, 640 F.3d 1117, 1124 (10th Cir.2011) (Indian tribe cannot create automatic tribal membership for the purpose of invoking ICWA protections on behalf of children not otherwise within the definition of Indian child). Because appellant's argument in support of her third assignment of error fails, I would overrule that assignment of error.

{¶ 100} Appellant's fourth assignment of error alleges FCCS failed to establish, by clear and convincing evidence, that the trial court should grant permanent custody of the children. The majority finds this assignment of error is moot based on its disposition of appellant's third assignment of error. I would address the merits, however, because I would overrule appellant's third assignment of error. I find the trial court's decision to grant permanent custody was not against the manifest weight of the evidence. The record contains competent, credible evidence supporting the trial court's findings that the children could not, and should not, be placed with either of their parents within a reasonable time,

and that granting the request for permanent custody is in the children's best interest.  *See* R.C. 2151.414(B)(1).  Thus, I would overrule appellant's fourth assignment of error.

{¶ 101}  Because I would overrule all four of appellant's assignments of error and affirm the trial court's judgment, I respectfully concur in part and dissent in part.

———————